MARLEY CONSTRUCTION Co., et al. *v.* WESTBROOK

No. 40957 December 15, 1958 107 So. 2d 104

*Vardaman S. Dunn,* Jackson, for appellants.

*Lee, Moore & Countiss,* Jackson, for appellee.

McGEHEE, C. J.

This is an appeal by Marley Construction Company, Inc., and its insurance carrier, Employers Mutual Liability Insurance Company of Wisconsin from the judgment of the Circuit Court of Hinds County affirming an award under the Workmen's Compensation Act made by the attorney-referee which was appealed to the full Commission and there unanimously affirmed, and a reversal on the question of liability is sought here primarily on the ground that the testimony of the claimant was not supported by substantial medical evidence.

The claimant-appellee was 37 years of age at the time of the hearing before the attorney-referee; his family

consisted of a wife and seven children; he had been a switchman for the Illinois Central Railroad Company for eight and one-half years and thereafter worked continuously as a carpenter for a long period of time; and at the time of his injury on Wednesday, December 1, 1955 his average weekly wage was $97. He testified that while working on the tower of the new First National Bank Building in Jackson, he and a co-worker were lifting transite boards to be stood up and fastened thereon, and according to the testimony of the claimant, these transite boards weighed from 175 to 200 pounds each and were being received by the claimant and his helper from other helpers down below; and that while so engaged in this work he felt a "catch" in his lower back; that he worked for the remainder of that day and during Thursday and Friday when the job was completed, and that on the Monday following he went to see a general practitioner who referred him to an orthopedic surgeon, Dr. Thomas C. Turner, in Jackson for a further examination, after having rendered first aid to him by strapping his back.

At the beginning of the hearing before the attorney-referee, the latter dictated into the record the following: "Let the record show it is stipulated by and between all the parties in interest that at the time of the accident on which this claim is based the claimant had an average weekly wage of $97, that the defendants, employer, and carrier, have paid to the claimant herein compensation for 38 weeks in a total amount of $950.

The claimant testified that he had been doing carpenter work since 1942, and that all of his work prior to December 1, 1955 was heavy work; that he had taken all of the overtime work that he could get because he wanted it; that at the time of the alleged accident he was working on a scaffold sixteen inches wide and on which there was room for only two men to work and that "as we stooped over and picked it (transite) up this way, I felt a little

catch catch me in the back there;" that "it kinda stung and felt like a cramp, just one little spot there and I went ahead and worked that day and the rest of the week, I think, which was about two days more;" that "later on in the evening it hurt pretty bad;" that his foreman was present at the time of the accident "and I told him I kinda jerked a crick in my back and I would be all right;" that "I worked two days after I jerked a little crick in my back although it bothered me a lot."

After the award was appealed to the full Commission a further medical examination of the claimant was ordered to be made and the carrier was ordered to make arrangements therefor with Dr. Walter Neill or Dr. Charles Neill, and the claimant was directed to submit himself for such examination.

An examination was made by Dr. Walter Neill and he testified in regard thereto on August 13, 1957. Dr. Neill testified that he did not deny that the appellee has pain in his back but that based upon his examination, his pain was not the result of neurological trouble, and that from a neurological standpoint he found no disability.

Dr. Neill made a written report in which he stated among other things, "There is tenderness in the lumbo-sacral joint." His summary was that the case presented "a problem of low back pain without any evidence of nerve root compression and without any evidence of nerve pain," and that therefore, "this is an orthopedic problem and he has been examined and treated by a very competent orthopedic surgeon. From a neurosurgical standpoint, he has no disability."

After receiving this report from Dr. Neill, the Attorney-Referee adhered to his former decision and let the award of compensation stand, and this finding as hereinbefore stated was affirmed by the full Commission and later by the circuit court.

The claimant also testified that the pain remained in the same spot where he originally felt it and that it felt

"like a hot nail in there, kinda, or a burning, right in that one little spot."

Dr. Turner, when called as a witness on behalf of the defendants, testified that he saw the claimant first on December 27, 1955, and on January 4, 1956 this doctor reported in writing to the insurance carrier that he had seen the patient again on January 3, 1956, and in his report he stated: "His pain varies in intensity from time to time. He has been staying in bed most of the time on a bed-board, * * *. Examination reveals still mild paravertebral muscle spasm and mild tenderness over L5 S1 spine. Range of motion is still about as before, but straight leg raising test is negative bilaterally at 85 degrees. I believe this patient is improving gradually, and he was instructed to begin mild back and abdominal strengthening exercises, * * *. He has to continue very limited activity with rest most of the time, and is to return for a recheck in one week."

On January 22, 1956, the doctor reported again to the insurance carrier that he had seen the patient again on January 20, 1956, "at which time he stated that he had tried to do some work for two or three days the first of the week as suggested on previous visit, but his back began hurting again in the lumbosacral area and over the sacrum and left sacroiliac joint. He, therefore, stayed in bed for most of the time for two days and has improved considerably. He has been carrying out his back and abdominal exercises fairly well." In fact, the claimant cooperated with the doctors to the extent of undergoing a very painful operation after being advised in advance that it would be painful.

This report further states that "on examination there was still some mild tenderness over the L5 S1 spine * * * motion in the back was still at least 50 per cent in all directions and caused mild discomfort in the low back. Straight leg tests were negative bilaterally at 90 degrees, * * *." The report further states that "al-

though he has had a temporary setback, I believe this patient will gradually return to work with proper care and proper strengthening exercises." He was instructed to continue his exercises and to gradually start back to work. "If symptoms recur, he should slow down and rest in bed before they become really troublesome, * * *."

On February 3, 1956 the doctor reported to the carrier among other things that "on examination range of motion was about 50 per cent in all directions. Flexion was slightly more bothersome than other motions. Straight leg raising tests to 90 degrees on the right and the left caused some discomfort in the sacral area and there was still some mild tenderness on percussion of the sacrum. The patient stated that on occasion he does have some aching down the backs of both thighs."

On February 27, 1956 the doctor reported to the carrier that he had seen the patient again on February 24, 1956, and that the patient stated that he had been working around the church off and on but still has pain in the area of S1 spine. On examination he still had at least 75 per cent range of motion in the spine in all directions and no muscle spasm with negative straight leg raising and among other things said, "In view of the indefinite clinical picture and his failure to respond to adequate conservative therapy, this patient was thoroughly rechecked by Dr. Purvis and me and after due consideration it was decided that in all probability he has had merely a sprain of the ligament between L5 and S1 and should be able to return to work very soon. It was explained to the patient that in all probability he will have to work out the residual pain, but we can find no cause for any prolonged disability."

On March 5, 1956 the doctor reported to the carrier that he had seen the patient again on March 2, 1956 and that there was essentially no change since the last visit, but he stated further that "flexion was a little more uncomfortable than extension," and that he had advised

the patient to attempt to work in spite of pain, although I think he should be kept under observation and treatment until he is considerably better.''

On March 19, 1956 he advised the insurance carrier that he had seen the patient again on March 16, 1956, ''At which time he stated that since his last visit he has worked irregularly, but is still having pain, especially the last few days. The pain is still located in the previously mentioned area between S1 and S2 with localized tenderness in that area.'' The remainder of this report was essentially the same as prior reports.

On May 4, 1956 the doctor reported to the carrier that he had seen the patient again on May 1, 1956, ''At which time he stated he had persistent pain while working, the pain being still located in the previously described area with tenderness over the fifth lumbar spine, and being aggravated by extending the spine from the forward bent position but also by hyperextension. X-rays were again taken including left and right obliques of the lumboacral joint and spot lateral of the lumbosacral joint and these revealed faint lines on the laminae of the fifth lumbar vertebra which are suggestive but certainly not conclusive evidence of pedicle defects of this vertebra. In the spot lateral film there was noticed a small area of sclerosis between the inferior surface and the fifth lumbar vertbra and the base of the first sacral spine. Whether this represents a false joint cannot be definitely stated, but it is suggestive. On this basis, the tender area was injected, with attempt being made to inject between the fifth lumbar and the first sacral down deep against the sacrum.'' Then among other things the doctor stated in this report that: ''He still had localized tenderness over the fifth lumbar vertebra. He could flex to at least 80 per cent of normal but arising from the forward bent position caused considerable pain in the area of the fifth lumbar vertebra, as did hyperextension.''

The doctor made reports again on May 11, 1956, May 29, 1956, June 16, 1956, July 9, 1956, and in which latter report he stated among other things: "Examination revealed that there was essentially normal motion in the back with no lumbar spasm. There was still generalized tenderness about the lumbosacral joint area."

On August 13, 1956 the doctor made a report of an improved condition but finally on September 14, 1956 the doctor made a further report saying that the patient stated that he had nervous spells and the pain extended up the back of the neck and into his head at times, but mainly it was located over the sacral areas as before. "Examination revealed definite tenderness over about L5 and S1 spinous processes * * *." The remainder of the report was similar to the former ones and also stated that: "There was still some tenderness and that hyperextension still aggravated the discomfort." The report was concluded with the observation that: "As stated previously, it is difficult to account for this patient's symptoms on an organic basis, but he has been fairly consistent in his claims of aggravation by extension of the spine and by rotary motion. It may well be that as a last resort a lumbosacral fusion will have to be carried out on this patient."

The claimant testified to his pain in the regions referred to in this doctor's report and claimed that he had never suffered any pain in this region prior to his accident on December 1, 1955. Mr. D. F. Finch, Mr. Bernard Elmerick, and Mrs. Daisy Westbrook, wife of the claimant, testified as to his disability immediately following December 1, 1955, and testified as to his expressions of pain, his manner of walking and other facts and circumstances which corroborated the claim made by the claimant that he had suffered disability and was unable to work except part time since the time of his alleged injury. Mrs. Westbrook also testified that since the accident the claimant had become very nervous, impatient

and irritable with her and the children when he claimed to be suffering from pain. The medical testimony was to the effect that nervousness, impatience and irritability are consistent symptoms with the claim of suffering pain.

We are not unmindful of the fact that the appellants' main contention is that the question is not essentially whether the claimant suffered the pain that he claimed to have after December 1, 1955, but whether or not the proof shows the alleged disability was causally connected with an injury received on that date. But, we think it was for the consideration of the Attorney-Referee and the Commission as triers of the facts as to whether or not this claimant, a man approximately 37 years of age, and with a wife and seven children to support, and who had always been eager to make overtime in his work in order to properly support them would suddenly conclude to work from one to three days per week and sometimes quit working after he made only one-half a day and finally give up his trade entirely to become a sewing machine salesman—a job for which he was not adequately prepared in his training experience as a railroad switchman and a carpenter, and from which his earnings were so meager that he had to finally discontinue the work, rendering it necessary for his wife to seek employment to earn a livelihood for the family.

 ██ Moreover it is not necessary that medical testimony be supplied to establish the cause and effect of an injury of the nature which the claimant says that he sustained.

In 32 C. J. S., Evidence, Sec. 1038, beginning at page 1089, it is stated: "Uncontradicted or undisputed evidence should ordinarily be taken as true. More precisely, evidence which is not contradicted by positive testimony or circumstances, and is not inherently improbable, incredible, or unreasonable, cannot be arbitrarily or capriciously discredited, disregarded, or rejected, even

though the witness is a party or interested; * * *.'' See also Reyer v. Pearl River Tung Company, 219 Miss. 211, 68 So. 2d 442; and Wynn v. Vaughn, 33 So. 2d 711, (La. App., 1948); Southern Stevedoring Company v. Henderson, 175 F. 2d 863; Hampton Roads Stevedoring Corporation v. O'Hearne, 184 F. 2d 76; and Liberty Mutual Insurance Company v. Marshall, 57 F. Supp. 177.

In the case of Hamlin and Allman Iron Works v. Jones, 200 Tenn. 242, 292 S. W. 2d 27, the Supreme Court of Tennessee stated: ''That in no case have we gone so far as to hold that an expert's opinion is determinative of an issue, * * *.'' It would, of course, depend upon the nature of the ailment of which the claimant complains.

It was said in Yocum Creek Coal Company v. Jones, 308 Ky. 335, 214 S. W. 2d 410, that: ''A claimant, like any lay witness, may not undertake to make a prognosis, but he may state facts concerning his condition and these facts may be of such a nature as to enable the Board to determine the extent and duration of the disability even in the absence of medical testimony.''

The rule is well settled in Larson, The Law of Workmen's Compensation, Volume 2, Sec. 79.51, 79.52, pp. 299-302, as follows: ''We concede that in the great majority of cases, such testimony ordinarily is necessary because of the seeming absence of connection between a particular accident and a claimed resulting injury. But in other cases involving special and peculiar circumstances, medical evidence, although highly desirable, is not always essential for an injured employee to make out a prima facie case, especially if the testimony is adequate, undisputed and unimpeached.''

Mr. Larson cites the case from Rhode Island of Valente v. Bourne Mills, 75 A. 2d 191, which held that the entire course of events from the time of the accident may be considered and if they are sufficient to raise only the reasonable and natural inference that the accident and injury were causally related, a prima facie is made for

the claimant, and it then becomes incumbent upon the respondent to go forward on the evidence showing that the condition complained of was due to some ailment entirely disassociated from the accident.

In the case of Ingalls Shipbuilding Corp. v. Howell, 221 Miss. 824, 74 So. 2d 863, this Court held: "We do not intend to lay down any general rule that the commission must be bound by the testimony of any one or more medical experts. Cases may arise where the commission could, without medical testimony, find from common experience and common knowledge that there is causal connection between a heart attack and the condition under which claimant performed his work; but this is not such a case."

In the case of Reyer v. Pearl River Tung Co., supra, it was very aptly, correctly and ably stated by Justice Lee that: "The inability of doctors to put their fingers on the exact physical cause should not result in casting the claim overboard. With all the knowledge now possessed by the great medical profession, it is a matter of common knowledge that sometimes the diagnosis of human ailments baffles the greatest medical minds."

The sum and substance of the testimony of Dr. Neill was that from a neurological standpoint there was no disability. But, in this case the disability is shown by the overwhelming weight of the evidence and the testimony of the other physician, Dr. Turner, was that he couldn't say that the pain which the claimant claimed to have been suffering was related to the accident that he complained of, but neither of the doctors dispute that he suffered pain and the written reports of Dr. Turner, in our opinion, disclose that it was probably due to the accident sustained by the claimant. All the proof shows that the pain which had not previously existed began on the day of this accident and has continued to such an extent as to show permanent partial disability. We are, therefore, of the opinion that on the basis of the testi-

mony on behalf of the claimant and the written reports of Dr. Turner, there was substantial evidence before the Attorney-Referee and the Commission to warrant a finding that the pain suffered by the claimant was causally connected with the accident complained of; that, therefore, the judgment appealed from must be affirmed.

The order for the award recited that compensation had been paid through May 16, 1956. Temporary total disability benefits of $25 per week were awarded from May 17 through October 2, 1956, the date on which the claimant attained maximum recovery, and permanent partial disability benefits of $16.17 per week, as provided by Sec. 8 (c) (21) of the Workmen's Compensation Law, for the period beginning October 2, 1956 and continuing for 450 weeks, or $8,600, whichever sum shall be less in amount.

Thus proper credit has been given for the payments made. It was not necessary that the order should use all of the terminology of Sec. 8 (c) (21), supra, as to the right of future reconsideration by the Commission, for such right follows as a matter of law.

The motion of the appellee for the allowance of an additional attorneys' fee in this case so as to make the total fee not to exceed 33⅓ per cent, is hereby sustained, the Workmen's Compensation Commission having heretofore allowed attorneys' fee of 25 per cent of the total award.

Affirmed and motion for additional attorneys' fee sustained.

*Hall, Lee, Holmes* and *Ethridge, JJ.,* concur.