BATES *v.* THE MERCHANTS COMPANY, et al.

No. 42727          March 16, 1964          161 So. 2d 652

*Bobby J. Garraway,* Lumberton; *Edward J. Currie, Jr.,* Hattiesburg, for appellant.

*Dudley W. Conner*, Hattiesburg, for appellees.

KYLE, P. J.

This case is before us on appeal by Gerald Ellis Bates, claimant, from a judgment of the Circuit Court of Forrest County, affirming an order of the Mississippi Workmen's Compensation Commission which affirmed the findings of fact, opinion and order of the Attorney Referee denying the claim of the appellant for additional compensation benefits under the Mississippi Workmen's Compensation Act for injuries sustained by him on June 25, 1959, while engaged in the performance of his duties as an employee of The Merchants Company of Hattiesburg, Mississippi.

The record shows that the claimant is a white man who had an eighth-grade education and began work for The Merchants Company on May 19, 1959. Prior to

going to work for The Merchants Company the claimant had worked for L. O. Crosby at Poplarville, where his duties were to drive a tractor. The claimant was not required to submit to a pre-employment physical examination by The Merchants Company. There was no disputs about the fact that the claimant sustained an accidental injury arising out of and in the course of his employment by The Merchants Company on June 25, 1959, for which he was entitled to and was paid compensation for temporary total disability.

It was stipulated that the claimant's average weekly wage at the time of his injury on June 25, 1959, was $45 per week; and that the claimant has been paid compensation for 19 weeks and one day for temporary total disability amounting to $574.28, and that the employer and the insurance carrier had paid hospital expenses in the amount of $902.88, and medical expenses amounting to $784.23, all aggregating $2,261.39.

The claimant filed his application for additional compensation benefits, Form B-11, on March 21, 1960. The issue presented for determination by the Attorney Referee and the Commission was whether or not the claimant was still disabled at the time of the filing of his application, and if so, whether or not such disability was causally related to the injury complained of. Hearings before the Attorney Referee were begun on August 24, 1960, and were concluded on May 1, 1961. Twenty-four witnesses testified during the hearing. The Attorney Referee took the case under advisement and rendered his opinion on May 16, 1961. It was the opinion of the Attorney Referee that Bates' claim for additional compensation benefits should be denied, and an order was entered denying the claim. The opinion and order of the Attorney Referee were affirmed by the Commission on October 11, 1961. From the findings and order of the Commission, the claimant appealed to the circuit

court, and that court affirmed the decision and order of the Commission.

Only one question is presented for our decision on this appeal, and that is whether or not the circuit court on review erred in affirming the findings and order of the Commission.

It is earnestly contended on behalf of the appellant that the Attorney Referee and the Commission erred in accepting as true the testimony of the medical experts who examined and treated the appellant during the five-months period immediately following his injury, to the effect that the appellant had recovered from the disabling effects of the accident which occurred on June 25, 1959, and that the appellant's inability to work at the time of the hearing was attributable solely to a psychoneurotic condition not related to the work connected injury and other causes which existed prior to and independent of the above mentioned work-connected injury. It is therefore necessary that we summarize briefly the testimony upon which the findings and order of the Attorney Referee and the Commission were based.

The claimant testified that at the time of his injury, on June 25, 1959, he was carrying a fifty-pound box of pan trout, and was in the act of loading the same on a truck for delivery to customers when he slipped and fell on the loading platform and the side of his head hit the door of the truck and his leg hit the truck body going between the truck body and the loading platform. He stated that he was "addled" as a result of his fall, and two of three fellow-employees picked him up and sat him on the loading platform; that he had pain in the leg and the lower back and was nauseated and vomited, and he had a big knot on the back of his head; that he was taken to the Methodist Hospital in Hattiesburg, where he was seen by Dr. H. Grady Cook, the company doctor, who examined and treated him for his injuries. He was also examined and treated by Dr. Clay-

ton Cook. He was later examined by Dr. Emmett M. Herring and Dr. Francis Conn, and he was examined and treated by Dr. Richard W. Naef, a neurologist, at the University Hospital in Jackson. The claimant testified that, when Dr. Cook, who had treated him for a period of several weeks, dismissed him, he went to see Dr. Lloyd Z. Broadus in Purvis, and he had been going there ever since because he was sick and his back was hurting him. He also went to see Dr. Blaise Salatich, in New Orleans. Dr. Salatich prescribed a back brace and a cervical collar, which he was still wearing at the time of the hearing. They helped to ease his pain. He stated that he was still under the care of a physician at the date of the hearing, and was not able to do any work that he tried to do. He stated that he had never had any type of injury prior to going to work for The Merchants Company on May 19, 1959. The claimant testified that at the time of the hearing he still had pain in the back of his head, and he had headaches and vomiting spells; that his shoulders and arms became numb at times, and his leg still bothered him.

On cross-examination the claimant stated that he wore glasses prior to the accident, that he had worn glasses since he was in the third grade at school. He admitted that his eyesight was defective before his injury, and that he had to have others read some of the orders given him while he was working for The Merchants Company. He admitted that before his injury of June 25, he had vomiting spells, but attributed that illness to having eaten vienna sausage.

The claimant's mother testified that prior to the accident the claimant had never had any difficulty in obtaining employment because of his physical or mental disability; that since the accident he had complained of his head hurting him, that he had been very nervous and had suffered from nausea. An uncle of the claimant testified that he had known the claimant all his life; that

prior to his injury the claimant's physical condition and his willingness to work were good; that since his injury there had been a marked change in the claimant's physical condition, and the claimant had performed no work since June 1959. Arvid Johnson, a neighbor of the claimant, testified that the claimant had done some work for him four or five years prior to the hearing, and the claimant had performed the work satisfactorily; that he had visited the claimant in his home since June 1959, and most of the time he had been in bed when he visited him. The wife of the claimant testified that she and her husband had been married for six years; that he had never been sick or unable to work prior to his injury, but since his injury he had had dizzy spells and had been unable to work; that he still suffered from nausea and severe headaches; that his disposition was different from what it was, and "he was just a different person since he got hurt."

Dr. Lloyd Z. Broadus, general practitioner of Purvis, Mississippi, testified that he examined the claimant on September 27, 1959, at his home; that he had seen the claimant on 28 occasions since that time for the symptoms of pain in the head, vomiting and pain in the back. The claimant's symptoms were comparable to a whiplash injury. Dr. Broadus was of the opinion that the claimant was not able to return to physical labor, that the claimant did not have traumatic neurosis but dependency neurosis, which may have been aggravated by the trauma."

Dr. Blaise Salatich, an orthopedic surgeon of New Orleans, Louisiana, testified that he had been treating the claimant since June 27, 1960. He had seen the claimant on three or four occasions, and the claimant was still under his professional care. Dr. Salatich testified that, after his examination of the claimant, his impression was that the claimant had sustained: "(1) A contusional injury of head, cerebral concussion; (2) torsion type neck injury involving periarticular, capsular, ligament-

ous and musculo fascial structures cervical vertebrae, stretch type cervical nerve injury, subsiding residual dysfunction and causalgic pain; (3) crushing torsion type low back injury, involving ligamentous muscle fascial structures lumbo-sacral region, subsiding residual dysfunction, and low back pain; and (4) contusional injury right lower leg with hematoma, subsided.'' The doctor was of the opinion that the claimant was one hundred percent disabled for doing laborious, hard, strenuous, back-bending work, or work which required lifting, and the claimant was considered to be one hundred percent disabled as a whole.

Six doctors were called to testify on behalf of the employer and its insurance carrier.

Dr. H. Grady Cook testified that Bates was brought to the Methodist Hospital Clinic on June 25, 1959, for treatment for injuries which he had sustained in an accident while working for The Merchants Company. Bates stated to him that he had been injured while loading a truck; that the floor of the truck was wet and his foot slipped, and he fell about three feet. The fall knocked him out for a few minutes; his glasses were broken, and he hurt his lower back and his right leg. Bates stated that he was nauseated and in fact was vomiting at the time the doctor examined him. The doctor stated that his examination of Bates' scalp and skull revealed no evidence of injury that he could find. There was some muscle spasm in his lumbar region; but the doctor's main finding was a large bruise or contusion of the right leg in its upper one-third on the medial aspect. Bates had a large hematoma and some bleeding in that region. There was no spasm in the cervical region. The doctor put the claimant in the hospital and started giving him infusions of glucose and distilled water. His blood pressure was low, and he was showing some signs of shock. He was given dramamine, a preparation for nausea, and he was given demorol for his pain. He was

complaining of pain in his right leg and lower back and lower abdomen. X-rays were made of the lumbar spine and the knee. The X-rays of the lumbar spine showed no evidence of pathology of any sort. The X-rays showed a normal right knee. On June 26 Bates' pain was better, but he was still nauseated and vomiting. On July 1, it was noted that the hematoma in his right leg was softening, and the hematoma was aspirated. Several aspirations were given to the knee, and the hematoma was finally evacuated and completely cured. Bates was discharged from the hospital on July 13. A few days later the claimant was given treatment for duodenal ulcer. The doctor stated that Bates was examined again on July 20. He still complained of back pain, this time in the low back and dorsal back region between the shoulders. He had never made any complaint of pain in the cervical region up to that time. He also continued to complain of nausea. The doctor found no muscle spasm in the back at that time.

The doctor stated that he was out of the city on vacation for a period of two or three weeks after July 20, and Dr. Clayton Cook, his medical associate at the clinic, saw Bates twice while he was out of the city. During that period Bates was readmitted to the Methodist Hospital and was in the hospital when the doctor returned to his office on or about August 12. The doctor examined Bates again at the hospital on that date. The doctor found that the hematoma of the claimant's right leg had completely healed, but the claimant still complained of headaches and occasional nausea. The claimant was discharged from the hospital in Hattiesburg on August 14, and left immediately for Jackson for a consultation with Dr. Richard W. Naef, a neurologist.

Dr. Cook testified that he saw the Claimant several times thereafter during the last few days of August and the month of September. He still complained of headaches and dizzy spells and a weakness in his leg and

his feet, and he complained to a nurse of pain in his neck. But the doctor observed no swelling of his feet, and there was no weakness of the legs that the doctor could determine. The doctor advised him to get out and move around more and try to exercise his muscles and regain his strength in that way. The doctor saw the claimant again after he had been examined a second time by Dr. Naef on October 19. He had a copy of Dr. Naef's report which showed that there were no organic findings to account for the claimant's headaches and nausea and vomiting. He felt that it was time to give the claimant a final checkup, and get him back to work. He examined him again on November 5, and found no organic pathology, and the claimant was discharged and advised to return to work.

The doctor stated that in his opinion there was no causal connection between Bates' continued complaints and the accident that occurred on June 25, 1959, while he was working for The Merchants Company. He thought that Bates was pretty well over the effects of the accident by August 6, and after that date there were other factors that entered into Bates' anxiety and the cause of it.

Dr. Clayton S. Cook, a surgeon and general practitioner, testified that he practiced in the South Mississippi Medical Clinic with his uncle, Dr. Grady Cook, and that he examined Bates in June, 1959, following his injury. He found that the claimant had sustained a severe contusion of his right leg and a contusion of the head, and that he had strained his back. The doctor's primary interest in the case at that time was a hematoma of the leg which he aspirated. He stated that Bates was discharged from the hospital on July 12, 1959, but was readmitted to the hospital on August 3, 1959, with a severe nervous reaction. Bates stated at that time that he had continued to have headaches, back pain, vomiting and marked nervousness. The doctor's examination re-

vealed that Bates was suffering from an acute anxiety. The doctor was unable to find any cause for the claimant's pain in the back. He was unable to find any organic cause for the headaches or vomiting, and was of the opinion that most of the claimant's complaints were on an anxiety basis. The doctor felt that further studies were needed to rule out any organic damage to the brain. He conferred with Dr. Emmett Herring and the two together were unable to find any evidence of increased intracranial pressure. The doctor then called in Dr. Francis Conn; and Dr. Conn was unable to find any thing organically wrong with the patient. On August 7, 1959, a lumbar puncture was performed to determine whether or not there was an increased spinal fluid pressure. The chemical studies were all within normal limits. An X-ray examination of the skull was negative. Dr. Herring, however, discovered that the claimant had a so-called "Gun barrel type" vision, which was in no way related to the claimant's injury of June 25.

Dr. Emmett Herring, a specialist in the field of eye, ear, nose and throat, who was connected with the Green Clinic in the City of Hattiesburg, testified that Bates had been sent to the Green Clinic by a health nurse in February, 1946, when he was 9 years old, for an examination of his eyes, and it was found at that time that he had a considerable amount of astigmatism in each eye, being a little nearsighted in the right eye and a little farsighted in the left eye, along with astigmatism. In April of that year Bates was fitted with glasses for his eyes to correct the stigmatism or nearsightedness. Bates was seen again in February, 1948. The stigmatism was a little better at that time, but minor changes were made in the lenses in his glasses. He was again seen at the Clinic in December, 1948. He had broken his glasses, and came to have them rechecked, and new glasses were made for him. The correction for astigmatism was greater at that time than it had been before.

Dr. Herring did not see Bates again until June 30, 1959, when Bates was referred to him by Dr. Cook after his injury of June 25, 1959. Dr. Herring testified that Bates told him at that time that he had broken his glasses and had hurt his leg when he fell while at work. The doctor stated that he made an examination of Bates' eyes, and new glasses were made for him. With proper glasses, his vision was 20/80 plus two in the right eye and 2/20 in the left eye. The doctor's diagnosis at that time was primarily astigmatism — that was the claimant's basic trouble. The astigmatism was not in any way attributable to trauma.

Dr. Herring testified that he next saw the claimant on August 8, 1959. The purpose of his examination of the claimant on that date was to determine whether or not there was any brain injury. The doctor found no evidence of injury insofar as his head was concerned; but the doctor found that the claimant did not move his eyes together properly. There was no evidence of a definite paralysis in any of the muscles; that the claimant had a constriction of the visual field or what is sometimes called "shotgun" vision. The doctor found no evidence of actual organic damage to the eyes or the brain, and the doctor recommended that the claimant be examined by a neurologist, and Dr. Cook sent the claimant to a neurologist. The neurologist's studies and findings were later made available to Dr. Herring and were examined by him. There was no evidence of increased inter-cranial pressure due to an injury. The doctor was asked whether he could demonstrate any causal connection between Bates' eye difficulties and his injury of June 25, 1959. His answer was, "I cannot, no sir."

Dr. Richard W. Naef, a neurologist and a qualified psychiatrist, of Jackson, Mississippi, testified that he saw Bates the first time on August 14, 1959, when Bates was referred to him for a neurological examination by

Dr. Cook. The doctor found that Bates had bruised his right leg, but there was no evidence of the leg injury at the time he examined him. Bates continued to complain of pain in the leg, which was probably due to muscle spasm with aching rather than any other type of disability. The doctor found that there was no real evidence of nerve root injury or injury of the spinal cord inside the spine. But the doctor decided that he would have a myelogram made in order to rule out the possibility of a herneated lumbar disc, and arteriograms in order to rule out the possibility of a subdual hematoma collection of blood over the brain. These tests were made. The lumbar myelogram was normal and the arteriograms were normal. In these tests there was no evidence of a ruptured disc or other intra-spinal lesion, and the arteriograms ruled out a subdual hematoma or other space-taking lesion in the head. The tests which the doctor made showed no focal or localized abnormality that would be consistent with a brain trauma. The claimant remained in the University Hospital six days. The doctor saw him 8 or 10 times, and at no time was there any objective evidence of a disease of the nervous system. The doctor on August 20 referred the claimant to Dr. Thomas H. Blake for an orthopedic examination because of the patient's persistent complaint of low back pain. Dr. Naef stated that he examined Bates again on October 19, 1959, and he found no evidence of an organic neurological lesion, either of his brain or his spinal structure. His headaches, in the doctor's opinion, were due to emotional tension causing muscular tension and vascular dilatation in the scalp, and his complaints were physical without organic basis. The doctor stated that the type of neurosis that Bates was suffering with was not of a permanent nature—"It is the temporary state of anxiety." He stated that Bates was "that type of person who is going to be chronically and recurringly ill in one thing or another, out of work

for one rreason or another, dependent upon his family and society.''

Dr. Thomas F. Blake, a specialist in orthopedic surgery, testified that Bates was referred to him by Dr. Naef for an examination on August 20, 1959. The patient had numerous complaints, but at that time he did not appear to be in any special pain. The doctor stated that the various tests that were carried out were normal. Bates' reflexes were normal, the movement of the spine was normal. Numerous X-rays were made available to the doctor for his inspection, including X-rays of the skull and the spine. The vertebrae appeared to be of normal size, shape and structure, and of normal relation to one another without visible evidence of recent or old bony trauma. The doctor stated that at the time he examined Bates it was his impression that Bates had suffered a mild sprain of the back and a contusion of the right leg which was decidedly improved. He did not find anything from an orthopedic standpoint that would prevent Bates from going back to work.

Dr. Charles R. Neill, a neurosurgeon, of Jackson, testified that Bates was referred to him by Dr. Naef for a neurological examination on February 16, 1960. Bates complained of headaches, a swelling of the right eye, and nervousness. He gave the doctor a history of having been hurt when he fell at The Merchants Company in Hattiesburg about seven months previously. The doctor stated that on a neurological examination he found that Bates alternated his vision. In other words, he was a little cross-eyed in his appearance; yet he walked with a steady even gait. The cranial nerve functions were intact, except for a lack of coordination of eye muscle movements. There was no motor weakness. The doctor reviewed Bates' films, arteriograms and skull X-rays, and he saw no evidence of any intracranial neurosurgical lesion such as a subdural hematoma tumor which would account for his disturbances and complaints.

The doctor stated that it was not unusual for a person to be born with a lack of coordinated vision, that many people have a lack of such vision and never know it. The doctor stated that from a neurological standpoint he found no reason for Bates not returning to work.

■■ After a careful review of the record in this case, we think that it cannot be said that the circuit court erred in affirming the findings and order of the Workmen's Compensation Commission. The Commission, in our opinion, had a right to accept as true the testimony of the medical experts who examined and treated the appellant during the five-months period immediately following his injury of June 25, 1959, to the effect that there was no causal connection between the injury complained of and the appellant's inability to work at the time of the hearing.

■■ It is generally held that where the claim for compensation is based on a mental or nervous disease allegedly resulting from an industrial accident, the accident must be established by evidence bringing it within the realm of probability, and the causal connection with the accident must be proved by clear evidence. 100 C.J.S., Workmen's Compensation, Sec. 555(15), pp. 721, 722.

In Thompson v. Railway Express Agency (1951), 241 Mo. App. 683, 236 S.W. 2d 36, 39, the Court said: "A psychoneurosis under some circumstances does present compensable injury, but this should not open the way for indiscriminate compensation on that score simply because it follows an accident. The causal connection with the accident must be proven by clear evidence, for such a neurosis may arise from any number of causes."

■■ The courts have generally held that, expert or medical testimony is not essential in every industrial injury case to establish the fact, character, and consequence of an accident or injury, but it is necessary in cases where there is a serious question resolvable only

by skilled determination and which is not within the knowledge of lay witnesses or members of the fact-finding tribunal. 100 C.J.S., 672, Workmen's Compensation, Sec. 555(5)b. See also Marley Construction Company v. Westbrook, 234 Miss. 710, 107 So. 2d 104; Cole v. Superior Coach Corp., 234 Miss. 287, 106 So. 2d 71; International Paper Co. v. Wilson, 243 Miss. 659, 139 So. 2d 644.

The evidence shows that the appellant had had trouble with his eyes since childhood, and several co-employees who worked with the appellant during the five weeks immediately prior to his injury of June 25, 1959, testified that the appellant had suffered from nausea and vomiting prior to his injury. The evidence also shows without dispute that the contusional injury to the appellant's leg had subsided. The doctors who examined and treated the appellant during the several weeks immediately following his injury found no evidence of brain trauma or ruptured vertebrae.

■■ ■ This Court has held in numerous cases that the Commission is the trier of fact, and where there is substantial evidence to support its decision this Court will not reverse the findings and order of the Commission.

■■ ■ The testimony of the medical experts who examined and treated the appellant during the five-months period immediately following the accident which resulted in the injury complained of was sufficient, in our opinion, to support the finding of the Attorney Referee and the Commission that the appellant had fully recovered from the work-connected physical injury at the time of the filing of his application for additional compensation benefits; and the Commission had a right to believe from the evidence that the appellant's inability to work at the time of filing his application for additional compensation was not attributable to the claimant's accident of June 25, 1959, but was attributable

solely to a psychoneurosis having no causal connection with the accident. Incapacity for work due to a mental condition not resulting from a workconnected injury, but due to other causes, is not compensable. Rathborne, Hair & Ridgeway Box Co. v. Green, 237 Miss. 588, 115 So. 2d 674; International Paper Co. v. Wilson, 243 Miss. 659, 139 So. 2d 644.

We find no prejudicial error in the record and the judgment of the lower court is therefore affirmed.

Affirmed.

*Ethridge, Gillespie, Brady and Patterson, JJ.,* concur.