FISHER *v.*
DANIELS, D.B.A. CAPITOL VENDING MACHINE SERVICE

No. 43424          April 5, 1965          173 So. 2d 908

*Crisler, Crisler & Bowling, F. Kent Stribling, Seeb Holmes,* Jackson, for appellant.

*Daniel, Coker & Horton, Melvin B. Bishop,* Jackson, for appellee.

LEE, C. J.

Mrs. Shirley Fisher brought suit against H. E. Daniels, doing business as Capitol Vending Machine Service, to recover damages for personal injuries sustained by her on account of the alleged negligence of the defendant. The declaration charged, in effect, that the defendant was the owner and operator of certain coin machines in the cafeteria of the General Electric plant in the City of Jackson; and that, on August 14, 1963, while she was seeking to obtain a purchase of merchandise from the machine, it, together with two other machines, of great weight, overturned, pinning her beneath them. She was

thereby seriously and permanently injured. Substantially it was charged that her condition was the direct and proximate result of the negligence of the defendant in failing to keep and maintain the machines in a steady and stable condition in order that they would not move or sway when they were operated, nor overturn and fall upon the users.

The answer of the defendant was a denial that he was guilty of any negligence in the installation or maintenance of such machines, and that they constituted any threat, peril or danger when used in the customary manner and for their customary purposes; and that the activities of plaintiff immediately prior to her injury were not reasonable, proper or safe.

Mrs. Shirley Fisher, weighing 115 pounds, was the mother of two children. Mrs. Sue Bell, weighing 111 pounds, was the mother of one child. Both of them worked at General Electric Plant on the late shift, of eight hours, running from 3:45 P.M. until 1:15 A.M. There was a break in the work about 11:45 P.M., and these women went to the cafeteria for the purpose of obtaining refreshments. There were a number of these machines, placed adjacent to each other. They weighed from 350 to 400 pounds each, and were approximately 71 inches high. Photos, describing such machines, were introduced in evidence.

Mrs. Fisher and Mrs. Bell put their coins in one of the machines and obtained ice cream bars. They ate the ice cream, and then decided to get candy bars to take back to the floor. Mrs. Bell deposited her nickel in the second machine from the end, but received no merchandise. She bumped the coin slot without avail. Mrs. Fisher then inserted her coin in the machine, but no merchandise showed nor did her coin fall out. Since they neither obtained the merchandise nor got their coins returned, they pushed the coin return slot and pulled the knob. They did not beat on the machine hard.

They hit it with the palms of their hands. They did not pull on the machine. They did not bump any of the other machines nor try to pull them forward. Suddenly, without any warning, the three machines came over on Mrs. Fisher with the result that she was caught underneath them and badly crushed and her right ankle was seriously injured.

Mrs. Sue Bell corroborated the version of Mrs. Fisher about getting the ice cream bars and eating them. When she sought to get candy she got no merchandise and lost her money. Mrs. Fisher, in like manner, tried the candy machine, but got no merchandise, and lost her money too. They bumped the coin return, but nothing came out. So they pulled the coin return and bumped on it with both hands but without result. All of a sudden, the machines came over on them. She was able to get out of the way, but Mrs. Fisher did not. They knew nothing of a kitty, kept in the dispensary for the return of coins. Besides, the dispensary was not open that night. She said that she had used the machines before, had lost coins, and had bumped them in the same way. She said that the machines were shaky, and, if one would bump on them, they would rock.

Wiley Kaufman Warren had worked for the defendant about a year and a half or two years immediately preceding the accident. His job was to clean and keep the machines full of merchandise. The machines would be moved when cleaned under them. The coffee machine was large. The candy machines were narrow. They ordinarily use screws or bolt the lighter and thinner machines to the larger machine in order to give support and keep them from moving. This is for the safety of the machine and the protection of the people who use it. But when he cleaned the coffee machine sometime before the accident, they did not attach it to the machines involved in the accident. Sometimes wire bands were used for this purpose. From the vending knob to

the top of the door is the vending mechanism and that is primarily where the weight is. He described how screws or bolts could be used for this purpose. It is proper and most of the times, it is necessary to attach the machines to stationary objects. He was asked on cross examination if braces were put up where there is vandalism so the machines would not shake. He stated that this was correct.

About a week before the trial, Warren went to the General Electric Plant and the machines, involved in the accident, were attached to the coffee machine with a metal screw. He could not move the machines at that time. The candy machine was behind the other machine and had a metal screw running from it into the coffee machine body. At the Brunch House, the machines were away from the wall. The thin ones were away from the wall at the Standard Life Building. The larger machines are thicker and were placed edge to edge. At Knox Glass the machines were all braced.

Aaron Ford had worked for Capital Vending Machines about two and one-half years. He serviced them. On the night of the accident J. O. Reed, Jr., the Assistant Manager, called him about 1:00 A.M. to help set the machines up. Five others assisted. The three machines were lying on the floor. In the middle machine, he found a bent coin and several other nickles in the coin return. There were four or five coins, but the last two did not hang up the machine. He explained that the levelers, the small legs, are screwed up inside the machine, to level them; and that there are supposed to be lock washers on the brackets that hold the panels that the leveler legs screw into. He explained that Exhibit No. 3 was changed, after the accident. The machines had not been braced to the wall. The thin ones were not connected in any way to the big machines. He demonstrated how they should be tied together. Normally there are four legs, and two screws, on each side, to screw the plate

on, and the legs are up inside of this plate. If they are tied properly, there is no play between the machine and the plate. The four screws should be used to tighten the plate to the bottom of the machine. The bracket is connected to the bottom of the machine that normally holds the machine stationary. The legs were at two corners, but just one leg was between those outside corners. He did not know why they were used like that. He made no adjustments at that time as they did not have proper tools. The next day he himself tightened several screws that hold the plates on because some of these plates were loose. He put braces on the wall to keep an occurrence like this from happening again. It took him 45 minutes to one hour to remedy this trouble. He had to drill the wall to set the machines. They cannot be rocked now. The screws which he found out of alignment the next morning would cause the machines to rock easily.

H. E. Daniels, the defendant, identified the machines and pointed out that there had been a change of the alleged defective machine, but said that another identical machine had been substituted in its place. The machines were bolted together at the bottom and at the top. There was a kitty in the dispensary for the substitution of coins when the machine failed to act. He did not believe that the machines would fall without excessive abuse. If the plates are loose, it is the duty of the inspector to correct it. He did not recall that machines at any other place were braced. The one that actually fell was sent to the Swift & Company stand and was there at the time of the trial. Bracing was used only when there was excessive abuse of vandalism. He said that if the machines are properly adjusted they will not fall. But he admitted, on cross examination, that these machines did fall on the occasion of the accident.

Kenny Michael, an alleged expert, described tests that he made. He said that bolts were in the bottom and were

screwed properly. He went into a discussion of kinetic energy — how it may build up in weight. This occurs when the machine is not stationary on the floor. The thinner machines are the more unstable. He likened the building up of kinetic energy to a dog running across a bridge, causing the same to collapse. However, on cross examination, he admitted that a simple way to keep the force from starting would be to attach the machine to something stable. He explained how the braces are utilized to attach them. If attached, some levelling in either end will suffice. There is only one screw in the middle of the machine. There was some difference between the alleged defective machine and the one substituted. The plates are supposed to be tight and bolts are used for that purpose.

R. R. Ridgeway, connected with General Electric Plant, a witness for defendant, said that the machines are about 18 inches wide. He had seen employees, one of whom was Ford, at times tightening the machines. The nurse in the dispensary works only 8 hours during the day. He also testified that they have very honest employees at General Electric and had never been bothered with vandalism.

Ray Vickers, an employee of appellee as service man, said that he checked General Electric twice daily and opened the candy machine once daily. If any were shaky, he would check the levelling plates. They did pull and clean them shortly before the accident. He did not think that they would put them back without tightening them down. He said that there were no braces at General Electric; but he admitted that at Swift & Company a 2 x 4 was used to hold up plywood, and that, at Continental Can, a 2 x 4 was on the edge of the machines. He had not been in the Corner Beauty Shop.

J. O. Reed, Jr., although testifying generally as to maintenance, was, admittedly, not at the plant the next

morning when Ford observed the condition and braced the machines.

The jury returned a verdict for the defendant; and from the judgment entered, the plaintiff appealed.

The appellant has assigned and argued two grounds for the reversal of this cause, namely, (1) that the verdict of the jury was contrary to the great weight of the evidence and her motion for a new trial should have therefore been sustained; and (2) that the giving of certain named instructions for the defendant constituted reversible error.

■■ ■ The appellant and her witness, Mrs. Bell, related a straightforward account of the circumstances under which the machines overturned. Their evidence was neither disputed nor contradicted in its material features. It was not inherently improbable, incredible, unreasonable, or untrustworthy. In such circumstances, it should not be arbitrarily and capriciously rejected.

In the case of Reyer v. Pearl River Tung Co., 219 Miss. 211, 68 So. 2d 442 (1953), the opinion at pages 217-8, in dealing with the question of potency of evidence, cited 32 C.J.S. *Evidence* sec. 1038, pp. 1089-92, as follows: ''Uncontradicted or undisputed evidence should ordinarily be taken as true. More precisely, evidence which is not contradicted by positive testimony or circumstances, and is not inherently improbable, incredible, or unreasonable, cannot be arbitrarily or capriciously discredited, disregarded, or rejected, even though the witness is a party or interested; and, unless shown to be untrustworthy, is to be taken as conclusive and binding on the triers of fact; and where the evidence tends to establish a fact which it is within the power and to the interest of the opposing party to disprove, if false, his failure to attempt to disprove it strengthens the probative force of the evidence tending to prove it. Where there are no contradictions, the evidence of a witness must be considered as a whole and in the setting in which it was given.''

The 1954 edition of the text, 32A C.J.S. *Evidence* sec. 1038, pp. 727-48, while more elaborate, indicates no appreciable relaxation of that rule. The above stated rule in the Reyer case, *supra,* has been repeatedly affirmed. Shivers v. Biloxi-Gulfport Herald, 236 Miss. 303, 110 So. 2d 359 (1959); Marley Construction Co. v. Westbrook, 234 Miss. 710, 720, 107 So. 2d 104 (1958); Lee v. Haltom Lbr. Co., 230 Miss. 655, 93 So. 2d 641 (1957); Masonite Corp. v. Fields, 229 Miss. 524, 91 So. 2d 282 (1956); Webster Construction Co. v. Bates, 227 Miss. 207, 85 So. 2d 795 (1956).

The record showed that, on cross-examination Dr. John C. Caden said that his only record in his history of Mrs. Fisher was "patient was at work last night at General Electric when a vending machine turned over on her right leg." He did not recall having talked to Mrs. Fisher and he did not have the hospital records with him. The doctor then volunteered that he had a record that he had found in a letter that he had written. From that, he included in the history the following: "While at work at General Electric she (Mrs. Fisher) was trying to get a nickel out of a vending machine when she and another employee were rocking the machine when it fell over on to her."

Mrs. Fisher, on cross-examination, after reading the alleged statement, unidentified and not a part of the record, testified that she made a statement, but she did not say that, and that "he wrote it down." She reiterated the substance of the occurrence as she had previously stated. Her explanation appeared to be truthful and without disparagement of her narrative concerning the occurrence. As viewed in the light of the discrepancy between her statements, the "rocking" would clearly bear out the fact that the machines were unstable. Obviously such a situation could have been avoided, under the testimony of the appellee's expert Michael that kinetic energy could be kept in check by attaching

the machines to something stable. Thus the responsibility would be shifted to the defendant, whose duty it was to exercise reasonable care to see to it that the machines, which he expected the general public to patronize, were reasonably safe. Consequently the incident, on cross examination, was wholly insufficient to be classed as a contradiction of the appellant's version of the occurrence.

Besides, the witness Warren accounted for the unstable condition of the machines, following a cleaning attempt, when the two machines were not attached to the coffee machine. Also, when he saw the machines a week or two before court, they were then attached to the coffee machine and he could not move them.

The witness Aaron Ford, that night after the accident, helped other workmen to set up the machines; and, although there were legs at two corners only one leg had been placed between the other two corners, and he could not account for such omission. Adjustments were not made that night as suitable tools were not then available; but the next day, he saw that the plates were loose and he tightened the screws. Following that adjustment, he put braces on the wall to prevent a recurrence. In his opinion, improper alignment had caused them to rock. This condition was corrected in 45 to 60 minutes of his time so that the machines would not rock.

These machines were owned, serviced and maintained by the appellee for the purpose of securing patronage at the hands of the general public and especially the employees of the General Electric Plant, from which service, he derived compensation. They could become exceedingly dangerous, as may be noted from this accident. Needless to say, the appellee, in the exercise of reasonable care and diligence ought to be able to determine, at the time of installation, whether his machines are stable; and, if not, that such condition shall exist before the public is invited to use them. Besides,

such condition of stability should be maintained at all times. Patrons should not be required to undergo training in the operation of vending machines in order to exchange the required coin for the desired merchandise. It is a perfectly normal reaction, when a coin is depoisited in the slot and the patron gets neither the desired merchandise nor the return of the coin, to beat upon this inanimate object, as the evidence for the appellant shows that she did, to secure action. No person readily surrenders his money for nothing. Such conduct on the part of the victim should not be characterized as vandalism or excessive abuse.

Under the circumstances of this case, the overturning of these machines brings the court to the threshhold for the application of the doctrine of *res ipsa loquitur*. In the case of Peerless Supply Co. v. Jeter, 218 Miss. 61, 65 So. 2d 240 (1953), the opinion at pages 67-8, quoted from 38 Am. Jur. *Negligence* sec. 295, p. 989, as follows: ''The conclusion to be drawn from the cases as to what constitutes the rule of res ipsa loquitur is that proof that the thing which caused the injury to the plaintiff was under the control and management of the defendant and that the occurrence was such as in the ordinary course of things would not happen if those who had its control or management used proper care, affords sufficient evidence, or, as some time stated by the courts, in the absence of explanation by the defendant, that the injury arose from or was caused by the defendant's want of care.'' The opinion then documented the principle with the following Mississippi cases: Pongetti v. Spraggins, 215 Miss. 397, 61 So. 2d 158 (1952); Palmer v. Clarksdale Hospital, 206 Miss. 680, 40 So. 2d 582 (1949); Sanders v. Smith, 200 Miss. 551, 27 So. 2d 889 (1946); Penney & Co. v. Evans, 172 Miss. 900, 160 So. 779 (1935); Miss. Power & Light Co. v. Sumner Gin Co., 156 Miss. 830, 127 So. 284 (1930); Waddle v. Sutherland, 156 Miss. 540, 126 So. 201 (1930); Alabama & V. Ry. Co. v. Groome, 97 Miss. 201, 52 So. 703 (1910).

In Palmer v. Clarksdale Hospital, *supra,* it was pointed out, at page 698, that "the doctrine of res ipsa loquitur does not in any instance create a case of absolute liability, but simply raises a presumption or makes out a prima facie case of negligence to the extent that the defendant is called upon to meet it with an explanation." Again, the opinion there cited 38 Am. Jur. *Negligence* sec. 33, p. 1032, which said: "Proof of the fact of negligence may rest entirely in circumstances; in other words, circumstantial evidence alone may authorize a finding of negligence. Hence, negligence may be inferred from all the facts and attendant circumstances in the case, and where the circumstances are such as to take the case out of the realm of conjecture and within the field of legitimate inference from established facts, a prima facie case is made. The causal connection between an agency and the injury complained of need not be shown by direct evidence."

From a study of this record it is not understandable how a fair minded jury could reach the verdict which it returned in this case. The Court is of the opinion that such verdict is against the overwhelming weight of the evidence.

In view of the circumstances at the time of the injury, as governed by the applicable principles referred to in the above cited authorities, as well as Railway Co. v. Groome, *supra,* and Sanders v. Smith, *supra,* the Court is of the opinion that the evidence for the appellant made out a prima facie case of negligence against the appellee. Instead of facing that question and undertaking to rebut it, as he evidently undertook to do in fact, and, by submitting instructions on that issue to the jury, the appellee sought and was given by the court his unnumbered instruction, at pages 282-3 of the record, as follows:

"The Court instructs the jury for the defendant, H. E. Daniels, that the *fact that the machines* here in ques-

tion *fell* from their upright position *is not, of itself, any proof of negligence,* and in the case under consideration to warrant a recovery by the plaintiff in any amount whatsoever against the defendant, H. E. Daniels, *it is not enough* for her *to show the fall of the machines* in question, *or even that she was injured thereby; nor is negligence on the part of this defendant to be presumed or inferred by you from the mere fact of the occurrence* complained of in this case, *but* before the plaintiff can recover from this defendant, H. E. Daniels, the *plaintiff must prove by a preponderance of the credible evidence* in this case *that the defendant, his agents, servants, or employees failed to exercise that degree of care which a reasonably prudent person would have exercised under like or similar conditions,* and if such failure, if any you find, proximately caused the injuries, if any you find, to the plaintiff, unless the plaintiff has so proven such matters by a preponderance of the credible evidence in this case, it is your sworn duty to return a verdict for the defendant, H. E. Daniels.'' (Emphasis supplied).

Since the appellee installed, serviced and maintained the machines, he was in a position to ascertain and explain the cause while the appellant was not possessed of such information.

In the case of DeLaughter v. Womack, 250 Miss. 190, 164 So. 2d 762 (Miss. 1964), the opinion made certain observations which are in point here, to-wit: ''There is however a class of cases in which it is held that where the thing is shown to be under the management of the defendant, or his agent, and where an accident in the ordinary course of events does not happen when the business is properly conducted, the accident itself, if it happens, raises a presumption of negligence in the absence of any explanation.'' At page 770 it said: ''Since the defendant is in a situation to ascertain and explain the cause of the injury, while the plaintiff is not, it is

reasonable that the burden of such explanation should rest upon the defendant. Jones on Evidence, (2d Ed.), Civil Cases, sec. 15, p. 17; Jones on Evidence, sec. 183 at p. 217, supra.'' And finally at page 772, it is said: ''It has been said that 'While it is true that simply because an accident has occurred, negligence is not to be presumed, still, in determining the question of negligence, the fact that an accident has occurred may be and should be taken into consideration, in connection with all other facts and circumstances of the case, for the purpose of determining whether in fact there was negligence. Negligence may be inferred from the circumstances surrounding the injury, if not from the fact of the injury itself.' 38 Am. Jur., *Negligence* sec. 290, at p. 985.''

The principle in DeLaughter v. Womack, *supra,* was completely nullified in the above instruction. Under it, the falling of the machines and the injury were not proof of negligence, nor could negligence be presumed or inferred therefrom. This was error. The presumption and inference were sufficient to make a case. The appellee's defense should have been to rebut that presumption and inference.

The giving of the quoted instruction constituted reversible error.

Without setting them out for detailed comment, it is sufficient to say that appellee's given instructions, not numbered but copied at pages 273, 275, and 282-3 of the record, fit into the same pattern as the instruction, condemned above, and thus help to emphasize the harmful effect. The given instruction at page 281 is not supported by the evidence.

Attention must be called to the question of foreseeability. In the case of Matthews v. Thompson, 231 Miss. 258, 95 So. 2d 438 (1957), the opinion, at page 282, cited Cumberland Telephone & Telegraph Co. v. Woodham, 99 Miss. 318, 54 So. 890 (1910), and quoted therefrom

as follows: "... the negligent act of a person, resulting in injury, is the proximate cause thereof, and creates liability therefor, when the act is of such character that, by the usual course of events, some injury, not necessarily the particular injury, or injury received in the particular manner complained of, would result therefrom, provided the attendant circumstances are such that an ordinarily prudent man ought reasonably to have anticipated that some injury would probably result from the act done." The Woodham case, *supra*, is one of the landmarks in the jurisprudence of this State and has been repeatedly cited and re-affirmed.

It must be remembered that the task of framing instructions to embody the legal principles, and at the same time in language that will not mislead but enlighten the average jury is not an easy one, as may be readily appreciated; but it is the task, which belongs to counsel and the presiding judge in the court of original jurisdiction and not to the appellate court — it reviews, but does not originate. See Bloch v. Brown, 201 Miss. 653, 29 So. 2d 665 (1947), at page 664.

During the trial, objection was made to certain evidence for the appellant concerning the use of bracing after the accident. This question is not now properly before the court. As a matter of fact, the record is somewhat confused on account of the introduction of certain photos and the exhibit by appellee of machines in the courtroom. Without in any manner attempting to pass on the competency of this evidence, it may be said that it will be well, on a retrial of this case, for counsel to consider Sea Food Co. v. Alves, 117 Miss. 1, 77 So. 857 (1917); Standard Oil Co. v. Franks, 167 Miss. 282, 149 So. 798 (1933); Chicago Mill & Lbr. Co. v. Carter, 209 Miss. 71, 45 So. 2d 854 (1950), together with any other existing authorities. The Court hastens to say that it has not made a research of this question.

For the reasons heretofore stated, it follows that this cause must be reversed and remanded for a new trial.

Reversed and remanded.

*Jones, Brady, Patterson, and Inzer, JJ.,* concur.