740 So.2d 315 (1998)
WALKER MANUFACTURING COMPANY, a self-insured employer, Appellant,
v.
Anita G. BUTLER, Appellee.
No. 97-CC-00270 COA.
Court of Appeals of Mississippi.
August 4, 1998.
Rehearing Denied October 13, 1998.
Certiorari Denied December 17, 1998.
*317 Robert H. Faulks, Aberdeen, Attorney for Appellant.
Kenneth A. Miller, John G. Jones, Jackson, Attorneys for Appellee.
Before THOMAS, P.J., and COLEMAN, HINKEBEIN and PAYNE, JJ.
PAYNE, Judge, for the Court:

PROCEDURAL HISTORY
¶ 1. Anita Butler filed her petition to controvert on November 17, 1995, concerning a work related accident resulting in injury to her right knee. Following the completion of discovery an evidentiary hearing was held before the administrative law judge on May 8, 1996. Following this hearing, the administrative law judge in an order dated June 11, 1996, awarded Anita Butler temporary total disability benefits commencing on May 11, 1995, to October 12, 1995, and an award of permanent partial disability benefits of 87.5 weeks based upon a conclusion that she had sustained a fifty percent loss of the scheduled member leg injury. Feeling aggrieved, the employer appealed to the Full Commission, then to the Monroe County Circuit Court, both of whom subsequently affirmed the administrative law judge. Finally, Walker Manufacturing seeks relief from this Court after perfecting its appeal. After receipt of the record and a complete review of the law, we uphold the Full Commission's order.

FACTS
¶ 2. The claimant, Anita Butler, is a forty-five year old female and was a resident of West Point, Mississippi, at the time of her injury. Prior to working for Walker Manufacturing in February of 1994, the claimant had worked as a seamstress at Johnston Tombigbee Manufacturing Co. She had also worked as an automated machine operator at Artex in West Point and as a sales person at Wal-mart in Kosciusko. The claimant has a high school education and has no vocational training except an intermediate law course she had taken in contemplation of running for justice court judge in the early seventies.
¶ 3. The claimant's job description is that of an "order puller." With that job she is required to squat and bend in order to place mufflers, which vary in weight, but which weigh at least fifteen pounds each on pallets.
¶ 4. Butler suffered her injury on December 15, 1994, when she tripped over a bolt that had been affixed to the floor. When she fell, her right knee made contact with another bolt affixed to the floor. Thereafter, Butler was taken to see Dr. Arthur Brown in Aberdeen. Dr. Brown performed x-rays which were interpreted as normal. However, he observed and treated a three centimeter laceration on the right knee. He diagnosed the claimant as suffering a right knee strain, and after placing her on crutches released her back to work for light duty. After this untimely fall, the claimant returned to work the very day of her accident. On December 19, 1994, the claimant revisited Dr. Brown who noted that his patient continued to have a significant pain in her knee. He scheduled for her an appointment with Dr. Russell Linton, an orthopaedic surgeon practicing in Columbus, Mississippi, for further treatment.
¶ 5. The claimant was first seen by Dr. Linton on January 4, 1995. According to Dr. Linton, who testified by deposition, his initial evaluation revealed a possible partial tear to the anterior or middle portion *318 of her medial meniscus. Dr. Linton continued to treat the claimant through winter and early spring of 1995 in a conservative manner. While at these appointments, the claimant appeared to be improving, according to Dr. Linton, but experienced pain and swelling. At this time he determined that her symptoms indicated a chondral contusion and recommended surgery. The date for this determination of surgery was April 19, 1995.
¶ 6. On April 29, 1995, the claimant suffered another fall, injuring the same portion of her anatomy. Surgery was performed on May 26, 1995, where it was discovered that the claimant did, in fact, have a chondral contusion. However, surgery revealed that she did not suffer a meniscus tear as the MRI had indicated. A lateral retinacular release was performed. Dr. Linton testified by deposition that his findings on physical examination at his office along with his surgical findings were consistent with the claimant's history of her work-place injury. Dr. Linton was of the opinion that the work injury caused the chondral contusion and directly lead to the necessity for surgery and resulting impairment, limitations, and restrictions.
¶ 7. Dr. Linton released the claimant as having reached maximum medical recovery on October 12, 1995, and assigned the claimant with a seven percent permanent partial impairment to the right lower extremity as a result of the injury. On cross examination, Dr. Linton clarified the restrictions he had given the claimant concerning "repetitive" squatting and lifting. He stated that this activity should not occur more than once every five minutes.
¶ 8. Dr. Linton further testified that if the claimant's job requirements exceeded these guidelines, then the claimant would be permanently medically restricted from that type of work as a result of the injury. The administrative law judge found, and the Full Commission agreed, based on the testimony of both the claimant and the employer's representative, that the physical requirements of the claimant's job at the time of the injury rendered her paermanently medically restricted from that type of work.
¶ 9. The parties dispute whether the claimant is entitled to temporary total disability benefits. Walker takes the position that because the claimant was never off work for more than five consecutive days prior to her election to take voluntary layoff status, it should not be held accountable to the claimant for benefits. The claimant argues that she is entitled to temporary total benefits beginning May 11, 1995, the first date following which the claimant missed five consecutive days from work, through the date of maximum medical improvement.
¶ 10. On May 11, 1995, the claimant testified that she was sent home by personnel manager Mr. David Gill. Gill informed the claimant that since she was about to have surgery, she should go home and rest and come back to work after surgery. However, the morning before the surgery, Cheryl Matthews, an assistant personnel manager at Walker's Manufacturing, repeatedly called, insisting that she come to work.
¶ 11. On June 2, 1995, one week following surgery, the claimant returned to Dr. Linton in order to have her surgical stitches removed. Dr. Linton gave the claimant a note, dated June 2, which stated that the claimant should not work for three weeks in order to recover from surgery.
A conflicting account arose when Cheryl Matthews testified.
¶ 12. On June 5, 1995, Cheryl Matthews testified that she personally called Dr. Linton's office and reported that light duty work was available for the claimant. Further, she stated that the company received a return to work note dated June 5, 1995, written by Dr. Linton's nurse, indicating that the claimant was released to return to light duty work on that date. After the company contacted the claimant, she returned to light duty on June 6, 1995. She *319 then worked until the time of her "voluntary lay-off" on June 23, 1995.
¶ 13. Of partial concern in this case is the ex parte communication between Cheryl Matthews and Dr. Linton's office. The administrative law judge was of the opinion that an ex parte communication with the claimant's treating physician in a litigated case is barred in Mississippi civil practice, including compensation practice, and that the proper remedy for such violation of the patient's right of confidentiality is exclusion of the evidence.
¶ 14. Concerning the lay-off, the claimant testified that Mr. Gill informed her that the company was laying off some of its workforce and that she would likely be a candidate for a layoff because she lacked seniority. She further testified that at no time during this discussion was it brought to her attention that the people on voluntary lay-off would be brought back after the people on involuntary lay-off.
¶ 15. Cheryl Matthews testified that Walker's Manufacturing policy dictates that voluntary laid-off workers are called back after the involuntary workers. She further noted that the claimant has not been called back by Walker Manufacturing for rehire or reinstatement since leaving in June of 1995, and that almost everyone who went on involuntary lay-off after the claimant left the workforce have all been called back at this point.
¶ 16. In late August of 1995, the claimant began working part-time for Ken's Pharmacy three days a week at $5 per hour, and remained under that employment until January 1, 1996. The claimant also drew partial unemployment benefits in the amount of $65 per week during this employment period. On March 1, 1996, the claimant began working for Haas Outdoors at $5.75 per hour, at forty hours per week. She kept this job until April, 1996. Thereafter, she retained employment with the Department of Human Services on April 1, 1996, where she earned approximately $336 per week. Since that time the claimant has moved with her husband and has been unable to obtain other employment commensurate with her disability. Because the particular decisions of the administrative law judge's order are of such value in the appraisal of the issues as they have been presented, they are listed below.
1. Ms. Butler sustained an admittedly compensable injury to her right lower extremity as a result of her work injury of December 15, 1994, in the course and scope of her employment with Walker Manufacturing Company.
2. Ms. Butler was temporarily totally disabled from May 11, 1995, the first date on which she began missing in excess of five consecutive days in her employment, through the stipulated date of maximum medical recovery, October 12, 1995, and that the employer is entitled to credit for each week of wages earned by the claimant between May 11 and October 12, 1995.
3. The claimant has suffered a permanent loss of industrial use of her right lower extremity as a result of her admitted injury. Upon consideration of the evidence as a whole, the Administrative Judge is of the opinion that the claimant has suffered a 50% loss of industrial use of the right lower extremity, thereby entitling her to 87.5 weeks of permanent partial disability benefits in the amount of $243.75, with credit for permanent partial disability benefits previously paid by the employer.
4. Claimant is entitled to reasonable and necessary medical services and supplies previously incurred and which may be incurred in the future as the nature of the injury and the process of the recovery may require.
¶ 17. Several stipulations were given. The average weekly wage of the claimant at the time of the injury was set at $462.31 per week. The second stipulation is that the claimant reached maximum medical recovery on October 12, 1995. The third stipulation is that the employer has paid the seven percent impairment rating.
*320 ¶ 18. Finally, the claimant stated that she plans to move to Carthage, Mississippi, with her husband and would not return to work at Walker if asked to return because of the distance between Carthage and Walker's Manufacturing plant.

LAW AND DISCUSSION OF ISSUES

STANDARD OF REVIEW
¶ 19. The standard of review utilized by this Court when considering an appeal of a decision of the Workers' Compensation Commission is well settled. The Mississippi Supreme Court has stated that "[t]he findings and order of the Workers' Compensation Commission are binding on the Court so long as they are `supported by substantial evidence.'" Vance v. Twin River Homes, Inc., 641 So.2d 1176, 1180 (Miss.1994) (quoting Fought v. Stuart C. Irby Co., 523 So.2d 314, 317 (Miss.1988)). An appellate court is bound even though the evidence would convince that court otherwise if it were instead the ultimate fact finder. Barnes v. Jones Lumber Co., 637 So.2d 867, 869 (Miss.1994). This Court will reverse only where a commission order is clearly erroneous and contrary to the weight of the credible evidence. Vance, 641 So.2d at 1180; see also Hedge v. Leggett & Platt, Inc., 641 So.2d 9, 12 (Miss.1994). "This Court will overturn a[C]ommission decision only for an error of law or an unsupportable finding of fact." Georgia Pacific Corp. v. Taplin, 586 So.2d 823, 826 (Miss.1991) (citations omitted). Therefore, this Court will not overturn a Commission decision unless it finds that the Commission's decision was arbitrary and capricious. Id.

ISSUES PRESENTED

I. WHETHER THE COMMISSION ERRED IN AWARDING COMPENSATION, WHERE THERE WAS NO EXPERT MEDICAL PROOF OF CAUSAL RELATION BETWEEN THE CHONDRAL CONTUSION AND ANY ON-THE-JOB INCIDENT.
¶ 20. The employer argues that since there was no medical expert testimony connecting the chondral contusion with an on-the-job injury, it should not be held accountable under the Mississippi Workers' Compensation Act. Walker further argues that medical evidence is required in this and other cases "where there is a serious question resolvable only by skilled determination and which is not within the knowledge of lay witnesses or members of the fact finding tribunal." Bates v. Merchants Co., 249 Miss. 174, 161 So.2d 652, 659 (1964). In all but the elementary and routine cases, it is necessary to establish medical causation by expert testimony. Cole v. Superior Coach Corp., 234 Miss. 287, 106 So.2d 71, 72 (1958). The employer states that Dr. Linton was ambiguous concerning the connection of the injury with the chondral condition and via inference argues that the claimant's second fall, which occurred while she was at home could have been the reason for the chondral condition.[1]
¶ 21. However, the claimant directly refutes this proposition and states in her brief, "Dr. Linton clearly and unequivocally connected the chondral contusion with the work-place injury. Dr. Linton testified that his findings on physical examination at his office, along with the surgical findings, were consistent with the claimant's history of a work-place injury, and that the work injury caused the chondrol contusion and directly lead to the necessity for surgery and resulting impairment[,] limitations and restrictions."
¶ 22. Dr. Linton stated via deposition:
Q. Where [sic] the symptoms that she demonstrated to you and your findings on physical examination and your surgical findings consistent with the history *321 of a trauma that she gave you on the workplace at Walker?
A. Yes, they were.
¶ 23. Later in the record we find this:
Q. Okay. And let me ask you a couple of sort of legally phrased questions. Do you have an opinion based upon a reasonable degree of medical probability as to whether her knee problems, the surgery that you did, the resulting impairment limitations and restrictions we caused or contributed to in a significant manner by the injury that she related to you at work at Walker on 12/15, 1994?
A. They are, yes. You know, again, that's the only injury that I know of that she had to her right knee. And based upon that, commonly treating dashboard type injuries to the knee or a direct contusion that causes maybe a small laceration and bruising of the cartilage, that would fall in line with the type of injury she told me she had.
¶ 24. From the Commission's interpretation of the testimony offered to support the connection between the on-the-job injury and the chondral contusion, we agree that the medical evidence is unrefuted. As it stands today, "[w]e are reminded that workers' compensation law is to be liberally and broadly construed, resolving doubtful cases in favor of compensation so that the beneficent purposes of the act may be accomplished." Marshall Durbin Companies v. Warren, 633 So.2d 1006, 1010 (Miss.1994). Thus, we see no error committed by the Commission in finding that the claimant's chondral contusion was related to the injury of December 14, 1994.

II. WHETHER THE COMMISSION ERRED IN AWARDING ADDITIONAL COMPENSATION WHERE THERE WAS NO MEDICAL EXCUSE PRECLUDING BUTLER FROM WORKING AT LEAST FIVE DAYS, AS REQUIRED BY STATUTE.
¶ 25. Walker's next argument seemingly revolves around Miss.Code Ann. § 71-3-11 (Rev.1995). This section of the Act states:
No compensation except medical benefits shall be allowed for the first five (5) days of the disability. In case the injury results in disability of fourteen (14) days or more, the compensation shall be allowed from the date of disability.
¶ 26. From the time immediately following her injury states Walker Manufacturing, the claimant resumed work, in a manner commensurate with her condition. The employer also states in its brief that Dr. Linton testified that the claimant was only temporarily disabled from May 26, 1995, the date of her arthrosporic surgery, until May 30, 1995.
¶ 27. Dr. Linton testified:
Q. All right. Then after the surgery, I understand that you prepared another note regarding her work activities?
A. Yes, I did. The note is dated 6/5. It's written by my nurse, but again, it was under my direction and that she could return to light duty if a job was available and on 5/30, and that it was our impression that there wasn't a specific seated job available from June 2nd through June 5th and then on 6/6 that she could return to a seated job.
Q. All right. If I understand your note then and to follow up on a question Mr. Jones asked, she was actually temporarily totally disabled only from the date of surgery, May 26th, until May the 30th?
A. If a job was available, yes, sir.
¶ 28. Aside from that mentioned above, we have discovered from the record a note from the Columbus Orthopaedic Clinic, written by Dr. Linton and dated June 2 which states, "No work until seen in 3 weeks."[2] Thus, we have one note which mandates the claimant's forbearance from returning to work in order to heal from a *322 recent surgery and a conflicting note which states that the claimant should return to work on June 6, which was less that two weeks after surgery.
¶ 29. We have also found in the record a statement[3] concerning the length of the temporary total disability period.
Q. Just so the record will be clear, your period of temporary total disability for her would have been I guess when you took her off for surgery on 5/26/95 or was it before then?
A. Temporary total?
Q. Yeah. How long had you kept her off work completely before letting her go back to light duty?
A. Okay. I did say in my 6/23 note that I would let her, you know, work light duty or you know, have a seated job.
Q. So from 5/26/95 to 6/23/95 would have been the period of temporary total disability in you opinion?
A. Right.
¶ 30. Finally, the evidence denotes that the claimant was released from her work status in contemplation of her impending surgery on the 26th of May. This release took effect on May 11, and from all indications, it was Walker Manufacturing that released her in consideration of her injury and scheduled surgery. Specifically discussed on direct examination, the claimant stated concerning this period of time:
And Mr. Gill had talked to me and they were going to dismiss me that day and I asked them to wait and let me talk to Dr. Linton. And then that's when I went to see Dr. Linton, on the 3rd of May. And I stayed on until the 11th. And that's when they said that Dr. Linton wrote me a note saying that I needed a sitting job; and they said that even Mr. Gill said that with a sitting job getting up and down I could reinjure my leg and they didn't want that to happen again till after I had surgery, so they sent me home.
¶ 31. She did not return to work until June 6, almost a month later. This period of time certainly suffices for the five day waiting period which the employer argues does not exist.

III. WHETHER THE COMMISSION ERRED IN ITS INTERPRETATION AND APPLICATION OF THE RECENT SCOTT V. FLYNT DECISION OF THE MISSISSIPPI SUPREME COURT, AND OTHER EVIDENTIARY RULINGS.
¶ 32. The employer next contends that Scott v. Flynt, 704 So.2d 998 (Miss.1996) is inapplicable to the situation presented to this Court this day. After reviewing the Order of the administrative law judge, we are uncertain as to which portion of Scott the administrative law judge was following because of the lack of elaboration. However, after considering the circumstances surrounding this case, we are convinced that the administrative law judge's Order on that point was directed toward ex parte communications.
¶ 33. In Scott, the supreme court was faced with a question pertaining to ex parte communications between the treating physician's defense attorney and any medical providers having information on the plaintiff. Id. at 999. The Scott court clarified this State's rule pertaining to ex parte communications and cited the two prong rule from Horner v. Rowan Companies, Inc., 153 F.R.D. 597, 601-602 (S.D.Tex.1994) which held that (1) notice should be given to the plaintiff in order for communication to occur between the treating physician and the defense attorney, and (2) the plaintiff must acquiesce to that communication. Id.
¶ 34. In Scott, the supreme court held that, "the rules only permit the patient to waive the privilege and that to allow the treating physician to do so would deprive the patient of that very right." Id. at 1004. In other words, allowing the treating physician to control what information *323 is to be disclosed directly takes that privilege from the holder, the patient, and places the privilege in the hands of another.
¶ 35. Walker is correct in the sense that Scott should not be applied retroactively. However, even if the excluded note had been admitted saying that the claimant could return to work on the June 6, it would add nothing to the case because the claimant did, in fact, return to work for seated duty on the June 6. Even if Scott had been applicable, no discussion of it would be relevant because the employer was not prejudiced by the mistaken exclusion of the note.
¶ 36. Walker Manufacturing further argues that there was no medical proof that the claimant was unable to work more than the five day statutory waiting period. We disagree. Dr. Linton testified via deposition that the time from May 26, 1995, until June 23, 1995, would have been the period of temporary total disability in his opinion.[4] In a similar vein, Dr. Linton's testimony concerning his June 5, 1995, note which is part of the record states: "[i]t's written by my nurse, but again, it was under my direction and that she could return to light duty if a job was available and on 5/30, and that it was our impression that there wasn't a specific seated job available from June 2nd thorough June 5th and then on 6/6 that she could return to a seated job."[5] Reiterating the record, Walker Manufacturing, in contemplation of the claimant's surgery, released her to return home on May 11. As we read the record, evidence has been submitted that the claimant was indeed disabled for more than five days during the period revolving around her surgery.
¶ 37. As a further citation of error along these lines, the employer argues that the Commission erred in admitting an unsworn, unauthorized doctor's note stating that the claimant was released from work for three weeks, citing Georgia Pac. Corp. v. McLaurin, 370 So.2d 1359 (Miss.1979).
¶ 38. Dunn notes:
Errors along technical lines in the conduct of the hearing before the commission are not sufficient on review to cause a reversal unless substantial prejudice can be shown. The commission is allowed a wide latitude as to its procedure and the receipt of evidence. Also, when improper evidence is received, the error is not reversible, provided it does not appear that the decision was based upon such evidence.
Dunn, MISSISSIPPI WORKMEN'S COMPENSATION § 290 at 397-98 (3d ed.1982).
¶ 39. With that said, we note that the Commission did not err in admitting the doctor's note concerning the need for the claimant to take three weeks off from work to recuperate. The Commission, we assume, admitted this note for the purpose of fully understanding what occurred during this time. The employer was certainly not prejudiced by the note because the claimant did not act on it, but instead returned to work on June 6. Furthermore, we note that there was substantial evidence to uphold the administrative law judge's decision in the absence of this information. On appeal, the Mississippi Supreme Court and now the Mississippi Court of Appeals review matters of law de novo, while according the interpretation of the Commission great weight and deference. KLLM, Inc. v. Fowler, 589 So.2d 670, 675 (Miss.1991). So long as the Commission's decision contains no error of law and is based on substantial evidence, we will not disturb the findings. Metal Trims *324 Industries, Inc. v. Stovall, 562 So.2d 1293, 1296-97 (Miss.1990).
¶ 40. Given the beneficent purpose of the Mississippi Workers' Compensation Act, we cannot say that the Commission erred in the admittance of this testimony. Sperry-Vickers, Inc. v. Honea, 394 So.2d 1380 (Miss.1981).

IV. WHETHER THE COMMISSION ERRED BY AWARDING PERMANENT DISABILITY COMPENSATION OF FIFTY PERCENT, WHERE MEDICAL PROOF ESTABLISHED THE IMPAIRMENT RATING OF SEVEN PERCENT, AND BUTLER RETURNED TO WORK AND MADE WAGES CONSISTENT WITH HER PRE-INJURY WAGES.
¶ 41. Walker Manufacturing Company states in its brief that it has paid permanent partial disability benefits in the amount of $2,985.94, which represents the seven percent partial permanent impairment rating assigned to the claimant's lower extremity by Dr. Linton. The Commission on the other hand, Walker argues, awarded the claimant a fifty percent loss of industrial use of the right lower extremity, and in so doing failed to properly interpret and apply relevant statutory and case law authority. Furthermore, the claimant on cross-appeal argues that the Commission erred as a matter of law in awarding only 87.5 weeks of permanent partial disability benefits, based upon a finding that the claimant had suffered a fifty percent loss of industrial use of the injured extremity. Accordingly, she argues that she is entitled to an award of one hundred percent loss of industrial use of the lower extremity.
¶ 42. We disagree with the employer and the claimant and uphold the decision of the Commission as discussed below.

INDUSTRIAL LOSS OF USE
¶ 43. The Commission found that the claimant proved an industrial loss of use of the right leg of at least fifty percent. The Commission presumably based its decision on Dr. Linton's restrictions and limitations that he placed on the claimant and on the claimant's inability to perform fifty percent of her job.
¶ 44. The Mississippi Supreme Court articulated the difference between a medical disability and an industrial disability in Robinson v. Packard Electric Division, General Motors Corp., 523 So.2d 329 (Miss.1988). "Generally, `medical' disability is the equivalent of functional disability and relates to actual physical impairment. `Industrial' disability is the functional or medical disability as it affects the claimant's ability to perform the duties of employment." Id. at 331.
¶ 45. Vardaman Dunn, a noted authority on workers' compensation, has this to say with regard to the difference:
The question in these cases is the degree of loss of use of the member for wage earning purposes, and this issue is for determination from the evidence as a whole, including medical estimates related either to the functional or industrial loss and the testimony of the claimant and other lay witnesses as to the effect of the injury upon the employee's ability to perform the duties required of him in his usual employment. In this connection, a partial loss of functional use may result in total disability, and to reach this result it is not necessary that the employee be wholly incapacitated to perform any duty incident to his usual employment or business; but if he is prevented by his injury from doing the substantial acts required of him in his usual occupation, or if his resulting condition is such that common care and prudence require that he cease work, he is totally disabled within the meaning of the statute.
Dunn, MISSISSIPPI WORKMEN'S COMPENSATION 3rd Ed. § 86, p. 102, 103.
¶ 46. Indeed, more estimates of the medical or functional loss may have little value when compared with lay testimony *325 by the claimant that he suffers pain when attempting use of the member, and that he has tried to work and is unable to perform the usual duties of his customary employment. This is especially true when such testimony is corroborated by persons who have observed the claimant's attempt to work or who have refused to employ the claimant because of his apparent affliction. McGowan v. Orleans Furniture, Inc., 586 So.2d 163, 166 (Miss.1991) (citing Piggly Wiggly v. Houston, 464 So.2d 510, 512 (Miss.1985)).
The Mississippi Supreme Court has applied an industrial loss rate to the loss of use of a scheduled member in several cases. For example, in Tyler v. Oden Construction Co., 241 Miss. 270, 130 So.2d 552 (1961), the supreme court held that the claimant suffered a 100% loss of use of his leg and ankle although he was given a disability rating of approximately 50%. Likewise, McManus v. Southern United Ice Co., 243 Miss. 576, 138 So.2d 899 (1962), involved an on-the-job injury to the arm of the claimant. Only one doctor testified and he said that the claimant had suffered a 20% disability and there was nothing which indicated that he could not work. On the other hand, the claimant and his family testified that he was unable to work because of the pain in his arm. The Commission found that the claimant had suffered a 100% loss of use of his arm. This Court affirmed that decision saying that although the evidence was not as strong as it was in other cases, the evidence was substantial and supported the findings of the Commission. The Commission is not confined to medical testimony in determining the percentage of loss to be assigned to an injury. Malone & Hyde of Tupelo, Inc. v. Kent, 250 Miss. 879, 168 So.2d 526 (1964). Lay testimony may be considered to supplement medical testimony but "[t]he probative value of any witness' testimony is for the fact-finder to determine." R.C. Petroleum, Inc. v. Hernandez, 555 So.2d 1017, 1021 (Miss.1990). Factors which this Court has considered in determining loss of wage earning capacity include the amount of education and training which the claimant has had, his inability to work, his failure to be hired elsewhere, the continuance of pain, and any other related circumstances. Malone & Hyde of Tupelo, 250 Miss. at 882, 168 So.2d at 527. In other words, the determination should be made only after considering the evidence as a whole. Piggly Wiggly, 464 So.2d at 512.
McGowan, 586 So.2d 163 at 166-67.
¶ 47. Whether the claimant has suffered a one hundred percent industrial loss of use is a question of fact to be determined from the evidence as a whole. The testimony before the Commission and this Court is that of Anita Butler, Dr. Linton, and Cheryl Matthews.
¶ 48. The claimant was a forty-five year old woman with a high school degree. From her high school days until the time of his injury, she worked as a seamstress and had worked on occasion as a bookkeeper and receptionist. At the time of this hearing, she was working for the Medicaid division in the Department of Human Services in Clay County, Mississippi. At one point in her career, she was in sales.
¶ 49. While working at Walker Manufacturing, the claimant did not perform any one particular job. Rather, she was required to pull mufflers, place them on a conveyor, indulge in a significant amount of bending and squatting, then enter data on a computer concerning these mufflers.
¶ 50. Dr. Linton testified that the claimant has a seven percent permanent partial impairment of her right leg. He said that the claimant would be limited in activities such as bending and stooping. However, he released the claimant for sedentary type positions where she could sit to do the work.
¶ 51. The whole of this evidence indicates that the claimant is certainly limited in the jobs she will be able to perform *326 in the future. In particular, her "puller" job at Walker Manufacturing would be questionable if she elected to return to Walker, and will likely no longer be available as an alternative. Most likely, Ms. Butler will be forced to look for jobs which do not require the amount of strenuous labor her "puller" job required. From the record, it appears that the claimant is quite capable of entering several fields of employment. In Smith v. Jackson Construction Co., 607 So.2d 1119, 1128 (Miss. 1992), our supreme court noted that "[t]he evidence showed that Smith [claimant] unsuccessfully sought employment, he had an eighth grade education, was learning disabled, had no job skills other than performing manual labor, and was severely limited in performing manual labor due to his injury." The claimant in the case before this Court is not limited by a learning disability and has already demonstrated that she is quite capable of finding employment. As the Smith court later noted, "[I]f a claimant is unable to earn wages despite only a loss or loss of the use of a scheduled member, then the claimant is permanently and totally disabled." Id. at 1128. In our case, the claimant has earned wages and is fully capable of earning them in the future.
¶ 52. The evidence as a whole indicates that the finding of the Commission that the claimant suffered only a seven percent medical loss of her right leg was supported by substantial evidence. The testimony of Dr. Linton together with the claimant's testimony does not support a finding of one hundred percent industrial loss of use of her right leg, a scheduled member. Since the holding of the Commission on this issue is correct, we will not reverse the Commission on this issue and find the employers citation of error meritless.

V. WHETHER THE COMMISSION ERRED IN FAILING TO SUSPEND COMPENSATION BENEFITS OR TO GIVE PROPER CREDIT FOR UNEMPLOYMENT BENEFITS AND OTHER WAGES PAID TO BUTLER AFTER HER INJURY.
¶ 53. Walker Manufacturing states that the claimant collected unemployment benefits for six months as a result of her prior employment with Walker Manufacturing Company. The claimant also took a "voluntary lay-off" from her employment with Walker. Walker argues that receipt of unemployment benefits should preclude a recovery of workers' compensation benefits during this period or the amount received should be deducted in computing the worker's compensation payable.
¶ 54. While there is no Mississippi case directly on point concerning receipt of unemployment benefits and receipt of workers' compensation congruently, we do have the "collateral source" rule. Dunn states:
The collateral source doctrine has been consistently applied to deny third parties, whether tort feasors at common law or employers liable under the Act, credit for sums received by the claimant from a collateral source, wholly independent of such third party.
Dunn, MISSISSIPPI WORKERS' COMPENSATION, § 24 (3rd.1982 at Supp 1990).
¶ 55. Walker cites several cases in which to bolster its argument. Significant is the fact that these cases originate from Michigan and Pennsylvania, California, and Florida, and none of the cases cited originate from Mississippi. It is certainly a novel idea that the employer has suggested, but meritless nonetheless.
¶ 56. The employer also emphasizes the claimant's voluntary lay-off as part of its contention that payments received should be used to deduct from workers' compensation payable. On June 23, 1995, she was asked by her employer to go on voluntary lay-off status, and by doing so, she forfeited a salary and also placed herself at "the back of the line" in being called back to work, by taking unemployment with this status: There seems to be an argument that the claimant was misled in taking a lay-off.
*327 ¶ 57. After taking a lay-off, the claimant decided to work and found employment at Ken's Pharmacy three days a week earning $5 an hour. She then found and took work as a Medicaid travel coordinator earning $8.40 an hour. From this other employment, the employer contends that compensation should be suspended during this period, or the amount of wages earned from other employers should be deducted in computing the worker's compensation payable. Walker does cite numerous cases in which to support its position, but again, none originate from Mississippi.
¶ 58. The employer states on appeal that the Commission correctly ruled that Walker Manufacturing Company was entitled to a credit for each week that the claimant earned wages in the same or other employment prior to the date of maximum medical recovery, but the company argues that the Commission erred in failing to suspend benefits or to give a credit for the claimant's receipt of unemployment benefits or wages from other employment after the date of maximum medical recovery. After reading the employer's brief on this topic, we are unpersuaded. Were we to hold as the employer requests, our opinion would result in something incompatible with the spirit and purpose of the Mississippi Workers' Compensation Law.

VI. WHETHER THE COMMISSION ERRED IN AWARDING PENALTIES AGAINST WALKER MANUFACTURING COMPANY.
¶ 59. In the instant case, Walker Manufacturing Company employed the claimant after her on-the-job injury, until she voluntarily took layoff after reaching maximum medical recovery. She subsequently drew unemployment benefits against Walker Manufacturing Company, then found alternative employment. Walker Manufacturing mentions that no doctor ever precluded her from returning back to work at Walker.
¶ 60. The claimant argues that she began missing five or more days from work as of May 11, 1995. This occurred according to the claimant when Mr. Gill proposed that she take time off before her scheduled surgery because there was no work available for her condition which the doctor had stated as sedentary. Furthermore, Walker Manufacturing filed its Notice of Controversion on November 17, 1995.
¶ 61. Under Miss.Code Ann. § 71-3-37(5) (Rev.1995) of the Act:
If any installment payable without an award is not paid within 14 days after notice of injury, 10 percent of such installment is provided as a penalty, which shall be added unless (1) the employer, within such time, controverts the right to compensation in a manner provided by law, or (2) the non-payment is excused by the commission on a showing that the installment could not be paid within the time limit because of conditions over which the employer had no control.
Dunn, MISSISSIPPI WORKERS' COMPENSATION, § 299 (3rd. ed.1982). From our review, neither action was taken by the employer within the appropriate time frame. Thus, they violate Miss.Code Ann. § 71-3-37 (Rev.(1995)).
¶ 62. Likewise, the court in South Central Bell v. Aden, 474 So.2d 584, 597 (Miss. 1985), set forth three circumstances where an employer may be exempt from the penalty:
First, that the employer has paid compensation installments within fourteen days of when they become due; second, and in the alternative, that the employer has filed a notice to controvert within fourteen days of the day he received notice of the injury; or, third, that nonpayment, if it occurred, was as a result of conditions over which the employer had no control.
¶ 63. Reiterating our decision from above, we cannot find where Walker Manufacturing upheld the law as it applies in this case.
*328 ¶ 64. From a review of this issue and the law pertinent thereto, we disagree with the employer. Their issue presented simply has no merit.

CROSS-APPEAL
¶ 65. The claimant cites four issues on her cross appeal. Three have been addressed above. One issue does remain.

I. WHETHER THE COMMISSION ERRED IN ITS FINDINGS THAT THE CLAIMANT'S "MOTION FOR LEAVE TO INTRODUCE ADDITIONAL EVIDENCE" WAS NOT WELL TAKEN AND THEREBY DENIED.
¶ 66. While the claimant has cited this issue presented above, she has failed to present any argument which augments this citation of error. We are not obligated to present an argument on her behalf and we choose not to do so. R.C. Petroleum, Inc. v. Hernandez, 555 So.2d 1017, 1023 (Miss.1990). With that said, we state that this error is without merit.

CONCLUSION
¶ 67. Upon review of the record and consideration of the applicable law, this Court is constrained to affirm the Full Commission's order. After careful consideration, a review of the record, and the law as it pertains to the subjects mentioned above, we conclude that the claimant will have a diminished ability to retain employment in work similar to that she performed at Walker Manufacturing. However, the claimant has displayed that she is quite capable of securing employment elsewhere. We believe the Commissioners correctly interpreted the law in addressing the issue concerning industrial loss. Thus, we affirm the Commission's decision which was affirmed by the circuit court.
¶ 68. THE JUDGMENT OF THE MONROE COUNTY CIRCUIT COURT IS AFFIRMED. STATUTORY DAMAGES AND INTEREST ARE AWARDED. ALL COSTS OF THIS APPEAL ARE TAXED TO THE APPELLANT.
BRIDGES, C.J., THOMAS, P.J., and COLEMAN, DIAZ, HERRING, HINKEBEIN and KING, JJ., concur.
SOUTHWICK, J., dissents with separate written opinion joined by McMILLIN, P.J.
SOUTHWICK, Judge, dissenting:
¶ 69. The workers' compensation program is supposed to be both simple and expeditious, allowing employers and employees to resolve issues of job injuries without concern over fault. Instead cases such as this indicate the system can be as complicated as normal litigation. And as slow. Nonetheless, I am constrained to dissent and thereby suggest that even more delay is needed in ultimate resolution of the issues. I do so reluctantly. In my view there is not substantial evidence to support the Commission's decision either on temporary or on permanent disability benefits.

a. Absence of medical testimony on causation
¶ 70. Walker's first issue concerns whether medical testimony supported Butler's claim that there was a causal relationship between her medical problems and the fall at work. Walker summarizes a portion of Dr. Linton's deposition to the effect that he was unable to state the cause of the knee problems that Butler was suffering. However, there was another section of the deposition in which Dr. Linton answered affirmatively a question of whether the knee problems, the surgery, and the impairment were caused by the injury that Butler suffered at work. That is sufficient.

b. Butler disability for more than five days
¶ 71. Walker specifically refers in this issue to Miss.Code Ann. § 71-3-11 and argues that it requires proof that the claimant was unable to work for more than *329 five days. Actually, the statute only prohibits compensation other than medical benefits for the first five days of the disability. Once a worker is disabled for more than fourteen days, that first five day bar is removed. Both Walker and the majority here address the statute as if it would bar partial disability benefits unless the claimant was completely unable to work such as to be away from the employer because of the injury for more than five days. I find that the statute would allow benefits even if the claimant did not initially leave the job site, so long as there was an injury which created an industrial disability. Under Walker's construction of the facts regarding when Butler should have returned to work, it is still possible for Butler to prove that she later left work voluntarily but then was unable to return. The absence of a period of time during employment for which Butler was unable to work does not bar her from proving an industrial disability caused by an injury while employed by Walker.
¶ 72. A disability for which compensation is due requires an "incapacity because of injury to earn the wages which the employee was receiving at the time of injury...." Miss.Code Ann. § 71-3-3(i) (Rev. 1995). Regardless of whether Butler was unable to work for five continuous days while still on work status at Walker, she is entitled to show that she suffered a disability that affected her wage-earning capacity. There is a serious question of the length of time of Butler's temporary total disability, but the question does not arise under the five-day provision of section 71-3-11. I do not understand the employer's claim on appeal to be that Butler received five days too much compensation. Thus I find the statute to be irrelevant.

c. Ex parte communications
¶ 73. The Commission and the majority hold that the employer is barred under a recent supreme court decision from introducing evidence regarding a contact with the doctor three days after surgical stitches were removed and nine days after the surgery itself. As the administrative judge put it in her decision that was adopted by the Commission:
The undersigned is of the firm opinion that ex parte communication with a claimant's treating physician in a litigated case is barred in Mississippi civil practice, including compensation practice, and that the proper remedy for such violation of the patient's/claimant's right of confidentiality is exclusion of evidence. See Scott v. Flynt [704 So.2d 998 (Miss.1996)].
The ex parte communication in issue occurred June 5, 1995, which was five months before Butler filed her petition to controvert on December 4. Flynt barred the introduction of evidence obtained from a treating physician if it is obtained through an ex parte contact made without the patient's consent. Flynt, 704 So.2d at 1007. The request in Flynt was made in April 1992, four months after a complaint for medical malpractice was filed in December 1991, and two and a half years after the malpractice allegedly occurred in September 1989. The majority here finds that the holding of Flynt is fully applicable to the facts of our case. I disagree. I believe that Flynt's relevance here is to show that it does not affect the use of the evidence in question.
¶ 74. For clarity, I will repeat that the evidence that is being barred from admission is the following. Dr. Linton, the treating physician, was contacted by an official at the company a week after surgery and was asked about Butler's condition. The official notified the doctor that light duty work was available. In response Dr. Linton stated that Butler could return to such work, and a note was written by his nurse that same day permitting her to return to work.
¶ 75. Flynt's prohibition of ex parte communications arises from the "rules of evidence and rules of civil procedure [which] are only applicable during a court proceeding which includes discovery." Id. at 1006. The whole purpose for the discussion in *330 Flynt was to determine the validity of a trial court's order, obviously rendered during litigation over a malpractice claim, that the plaintiff-patient must sign a release permitting the defendant to talk to all medical care providers about the claim. Id. at 999. The context for the use of the phrase "ex parte" communications is Rule of Evidence 503. That rule discusses exceptions to the doctor-patient privilege, including the waiver of the privilege by a patient who places his or her medical condition into issue. That rule then states that the waiver "does not authorize ex parte contact by the opposing party." M.R.E. 503(f), quoted in Flynt, 704 So.2d at 1001. There simply is no "opposing party," there are not even "parties," before litigation has commenced.
¶ 76. Then what are the rules? Flynt says it applies to contacts during litigation. The concurring opinion states that outside of court proceedings, "duties on the part of physicians and other professionals to hold client communications in confidence which emanate from professional standards and elsewhere are sufficient to protect the public." Id. at 1007 (Banks, J., concurring).
¶ 77. I do not address whether this telephone call by an employer to check on when an employee should return to work invoked a patient-doctor privilege. Regardless, admission of evidence of the call was totally unaffected by Flynt, which concerns the acquisition of information during court proceedings by ex parte means. The case specifically says that the rules of discovery control the "gathering of medical information to the presently available formal discovery mechanisms absent express patient consent once the lawsuit has begun." Id. at 1006 (emphasis in original). Before court or administrative action has commenced, the rules of evidence and Flynt simply do not apply.
¶ 78. The evidence was relevant under M.R.E. 401 and not privileged, because the privilege applies to the disclosing of information. This information had already been disclosed in a manner that did not violate discovery. M.R.E. 503(b). Thus the administrative judge erred in my view in excluding evidence regarding the June 5 conversation and note. Whether the error was harmful can only be determining by analyzing the purpose to which the evidence would have been put. The fact that the claimant actually returned to work on the next day, June 6, was before the administrative judge. The note and conversation would have helped support the conclusion that Butler was in the mind of her physician physically able on that date to perform light duty.
¶ 79. In response to the factual issue raised by that evidence, Butler offered an unsworn note from Dr. Linton's office. It is dated June 2, 1995 and states "no work until seen in three weeks." The employer objected at the hearing on the ground that counsel had not previously been provided with it, and Dr. Lintonwho was "present" at the hearing only by deposition would need to be examined about it. Counsel also objected that the document was unsworn and otherwise not authenticated. It was ultimately admitted into evidence.
¶ 80. These competing versions of what Dr. Linton thought during early June primarily address the question of whether Butler was properly away from work for more than five days. As discussed under the previous section, that is in fact not an issue. The real issue is whether Butler was disabled for more than five days. To the extent this evidence also addresses the extent of Butler's disability, that will be discussed next.

d. Magnitude of disability
¶ 81. The employer next argues that the evidence and law do not support the Commission's determination that 1) the claimant was temporarily totally disabled from May 11 until October 12, 1995, and 2) that the claimant suffered a 50% loss of industrial use of her right leg, which was a permanent loss entitling her to 87.5 weeks of benefits.

*331 1. Temporary total disability

¶ 82. The Commission found it "undisputed" that Butler was "sent home" from work on May 11 because, as Butler testified, a company official "said that I needed a few days before surgery to rest up." The official told her that there was concern that she could reinjure her leg and wanted her to go home and avoid that. I would hold that an employer's decision to prevent an employee from working because of concern for a greater injury is the equivalent of a total temporary industrial disability regardless of medical evidence. By those actions, this employer found Butler to be physically incapable of earning her normal wages. The evidence sustains the finding of a total temporary disability starting May 11.
¶ 83. Where the disability ends is less clear. Surgery was on May 26. The employer offered evidence that by June 5 Dr. Linton believed that Butler could return to work if light duty was available. As already discussed, I find that this evidence was improperly excluded. Regardless of the admissibility of the informal note offered by Butler indicating that Dr. Butler thought that she should not return until June 23, a fact-finder could well conclude that the phone conversation of June 5 both occurred and modified what Dr. Linton's office indicated on the June 2 note.
¶ 84. Butler worked from June 6 until June 23, at which time she took a voluntary lay-off. Many workers were laid off, and Butler was never recalled to work. The Administrative judge found that Butler's job was revamped and the physical limitations regarding squatting and lifting were no longer relevant to the job. The judge did not assess when Butler's physical limitations may no longer have been applicable. The new equipment that made the job less physically demanding was being installed in December 1994 before the claimant's injury, but when it became fully operational was not stated. Even so, the administrative judge found that because the squatting and lifting previously were required for the job, that Butler could "no longer perform all of the substantial acts of her usual employment." The only evidence regarding the new requirements for the job is that squatting or lifting would be required two to three times a day at most. There is no evidence that such a requirement would have been beyond Butler's limitations.
¶ 85. There is no medical evidence that Butler remained totally disabled until October 12, 1995. The only relevance of that date if the testimony that it was the day of maximum medical improvement. It is true that the "MMI" date is important. It divides the period of temporary disability from that of permanent, if any. That date does not mean, however, that everything before it was total temporary. On the other hand, returning to work on light duty does not mean that the employee's temporary disability has ended. VARDAMAN DUNN, MISSISSIPPI WORKMEN'S COMPENSATION, § 75 at 89 (1990). All we necessarily know from that date is that medical opinion considers it the end of improvement from the medical treatment that was being received. The evidence essentially just tapers off after Butler's leaving employment with Walker on June 23.
¶ 86. I find that the Commission erred in two respects. The first was by excluding evidence of Dr. Linton's opinion on June 5 and thereby limiting the evidence on the nature and duration of Butler's injury. Secondly, I find error in holding that there was a total disability until October 12. There simply is no evidence to support that, and the evidence that she was working during this period for other employers disputes that finding. I would remand for additional findings on this issue.

2. Permanent partial disability
¶ 87. Dr. Linton assigned to Butler limitations on repetitive squatting, bending, stooping and lifting after she reached maximum medical recovery on October 12, 1995. Dr. Linton testified that Butler could squat and lift two times an hour but not every five minutes. He assigned a 7% *332 permanent partial impairment to her right leg. The Commission found that the 7 per cent medical impairment should be transformed into a fifty per cent loss of industrial use of her right leg. The only mention of "fifty per cent" in the evidence is that half of the time Butler's previous job involved squatting or lifting. Even if those physical requirements continued, which they did not, it seems inappropriate to translate that half into a fifty per cent industrial disability rating. At least some explanation for the transformation of half an apple into half an orange should be given.
¶ 88. What the Commission found here is a permanent partial disability in which the occupational effect of the loss (50%) exceeds the functional impairment (7%). Butler argues that the occupational effect should be 100% because the unrestricted use of her leg is so vital to her normal employment. Walker on the other hand argues that at most the occupational effect should be the same as the medical restriction. The supreme court has held that when an employee's occupational disability from loss of use of a scheduled member exceeds the functional or medical impairment, the worker is entitled to benefits calculated on the occupational disability. Walker Mfg. Co. v. Cantrell, 577 So.2d 1243, 1248 (Miss.1991). What is most important in these determinations is not law, but facts. Did the Commission have substantial evidence to find that this relatively small functional limitation had that large of an industrial effect?
¶ 89. As pointed out above, the only source for this "50%" occupational disability that I find is in the argument that repetitive squatting and lifting was half of the old job Butler had, even though it was not part of the new manner in which that same set of tasks was performed. I agree with Butler that if in fact she was unable to perform half the job, the better view is that she was 100% disabled from that job. But I disagree that the old form of the job is the relevant one. All that means is that in the future she is limited in how she could perform a job that does even exist. Further, Butler must show lack of capacity in "the same or other employment." Miss. Code Ann. § 71-3-3(i). By the date that this permanent partial industrial disability rating began, squatting and lifting were no longer physical requirements of her usual employment. For permanent disability the requirements in the present and future similar ones are also relevant.
¶ 90. Based on this evidence, I find it to be error to determine that Butler suffered a 50% occupational disability.
¶ 91. In summary, I agree that some temporary total disability should be awarded, but it was error to extend the period as far as October 12 in the absence of any evidence of a total disability that lasted that long. As to disability based on loss of use of a scheduled member, I find no substantial evidence to support the Commission's decision.
¶ 92. I would reverse on all benefits and remand for additional proceedings.
McMILLIN, P.J., joins this separate written opinion.
NOTES
[1] See record excerpts from Dr. Linton's deposition which denote that the claimant suffers from a possible chondral contusion in her knee. This diagnosis on April 19, 1995, was made ten days before her second fall.
[2] We have not discovered in the record whether or not this note was authenticated. The note may be found in Dr. Linton's deposition exhibit volume.
[3] See Dr. Linton's deposition testimony, pages 14-15.
[4] Dr. Linton noted that if the claimant had a sit down job using her hands she may have been able to perform some tasks. Linton Deposition pages 14-15.
[5] The note dated June 5 was discussed on the record, but was finally struck when the administrative law judge wrote that court's opinion. Having read the record, we find that the note's admittance or exclusion has little bearing on our decision today.